IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

KEITH WATERS,

                Plaintiff,

     v.

GALLAGHER, Captain, Bare Hill
Correctional Facility, *et al.*,

                Defendants.

_____

Civil Action No.
9:15-CV-0804 (LEK/DEP)

APPEARANCES:

FOR PLAINTIFF:

KEITH WATERS, *Pro se*
06-A-2999
Wallkill Correctional Facility
Box G
Wallkill, NY 12589

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN
New York State Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

OF COUNSEL:

KEITH J. STARLIN, ESQ.
Assistant Attorney General

## REPORT AND RECOMMENDATION

This is a civil rights action brought by *pro se* plaintiff Keith Waters, a New York State prison inmate, against four individuals employed at the correctional facility in which he was incarcerated at the relevant times pursuant to 42 U.S.C. § 1983. Plaintiff complains of a misbehavior report issued to him for allegedly being tardy in reporting to the facility's law library and the disciplinary proceedings that followed. Plaintiff contends that the issuance of the misbehavior report and the resulting guilty determination were motivated by his race. Plaintiff's complaint, as amended, asserts claims for deprivation of due process and equal protection.

Currently pending before the court are cross-motions for summary judgment. For the reasons set forth below, I recommend that defendants' motion be granted and plaintiff's be denied.

I.    <u>BACKGROUND</u>[1]

Plaintiff is an inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* [Dkt. No. 14](#). At the times relevant to his claims, Waters was incarcerated in the Bare Hill Correctional Facility ("Bare Hill"), which houses approximately five-hundred fifty inmates in dormitory style housing, and was assigned to the J2 housing unit.[2] *Id.* at 5, 8. The J2 unit at Bare Hill is located in an annex adjacent to the main complex of the facility. [Dkt. No. 86-18 at 7](#). The law library of the facility is located in the activity building within the main complex at Bare Hill. *Id.* The J housing unit, to which plaintiff was assigned, is the housing unit in the annex that is closest to the activity building where the law library is located. *Id.* To travel from the J housing unit to the law library, an inmate must walk through a door in that building leading directly outside, walk along a path through a compound gate separating the annex from the main complex, and then

---

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in the non-movant's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). In this case, in light of the parties' cross-motions for summary judgment, the court draws "all factual inferences . . . against the party whose motion is under consideration." *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005) (quotation marks omitted).

[2]    In describing Bare Hill, plaintiff's amended complaint at one point makes reference to "Wallkill." [Dkt. No. 14 at 5](#). The court assumes the description that follows was intended to describe Bare Hill.

enter the activity building. *Id.* Once inside, the inmate then must walk through the activity building, passing an inmate barber shop, the general library, bathrooms, and the facility chapel, to get to the law library. *Id.* According to the defendants, it should take no more than five minutes to walk from the J2 housing unit to the law library. *Id.*; *see also* Dkt. No. 86-4 at 13; Dkt. No. 86-8 at 13-14; Dkt. No. 86-18 at 7; Dkt. No. 86-19 at 10. Plaintiff contends, however, that the distance between his dormitory and the activity building is approximately one-half mile. Dkt. No. 14 at 8; *but see* Dkt. No. 96-4 at 2 (declaration of Felix Moran, an inmate confined in Bare Hill during the relevant time period, stating that the distance between J2 housing unit and the activity building is only 800 feet).

The daily schedule for inmates at Bare Hill is dictated by the Bare Hill Facility Operations Manual ("FOM") 11.26. Dkt. No. 86-4 at 11; Dkt. No. 86-18 at 5; *see also* Dkt. No. 86-5. The version of FOM 11.26 that was in effect on the day in question provided, in relevant part, for a 3:30 p.m. housing unit count, and that when the count is cleared, programs and recreation follow. Dkt. No. 86-4 at 12; Dkt. No. 86-5 at 2-3. Typically, the 3:30 count is finished by 3:40 p.m. Dkt. No. 86-4 at 12. Copies of FOM 11.26 are maintained in all inmate housing units and are available for inmate review. *Id.* at 11. In addition, new inmates at Bare Hill are made

aware of the daily schedule at orientation and instructed that it must be followed. *Id.* at 11-12.

On May 24, 2014, plaintiff was scheduled to attend a law library program beginning at 3:45 p.m. Dkt. No. 86-4 at 8; Dkt. No. 86-8 at 13; Dkt. No. 86-18 at 6; 86-19 at 8. On that date, defendant Thomas LeClair, a corrections officer, was assigned to work in the law library. Dkt. No. 86-18 at 8. At approximately 3:50 p.m. on May 24, 2014, after the housing unit counts were completed and afternoon programming had begun, a group of three inmates arrived at the law library at about the same time. Dkt. No. 86-18 at 8; *see also* Dkt. No. 86-17 at 8. One of those inmates was housed in J2, the same unit to which plaintiff was assigned. *Id.* Approximately fifteen minutes later, plaintiff arrived at the law library and signed the law library log-in book.[3] *Id.* Shortly after plaintiff arrived, defendant LeClair approached him and asked why he was late. Dkt. No. 86-18 at 9.  Plaintiff responded merely by shrugging, but did not offer any excuse or reason to explain why it had taken him so long to get from his housing unit to the law library. *Id.*

---

[3]      There is a slight dispute over the time that plaintiff entered the law library. According to defendant LeClair, plaintiff entered the library at approximately 4:05 p.m. on May 24, 2014. Dkt. No. 86-18 at 9. Plaintiff claims, however, and the logbook reflects, that he arrived at the law library at 4:00 p.m. Dkt. No. 86-17 at 8.

Defendant LeClair then telephoned the corrections officer on duty in the J2 housing unit, Corrections Officer Coccia, and asked him if he knew of any reason why plaintiff would have taken so long to get to the law library. Dkt. No. 86-18 at 9. Coccia responded that the J2 unit count had cleared in a timely fashion and that the inmates from that unit, including plaintiff, had left the unit at between 3:40 and 3:45 p.m. *Id.* Defendant LeClair then called the area sergeant on duty and informed him of the situation. Dkt. No. 86-18 at 10. The sergeant made the decision to have plaintiff returned to his J2 housing unit. *Id.*

Defendant LeClair prepared a misbehavior report on May 24, 2014, charging Waters with being out of place and a movement violation, in contravention of DOCCS prison rules 109.10 and 109.12, respectively. Dkt. No. 86-18 at 10; Dkt. No. 86-9. The misbehavior report was reviewed by a sergeant and forwarded to defendant David Theobold, a corrections lieutenant, to designate the level of the disciplinary charges.[4] Dkt. No. 86-

---

[4]      The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include disciplinary confinement for a period of up to thirty days in the SHU. *Id.*, *see also* Dkt. No. 86-19 at 3. Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.* The designation of which tier level to assign to a particular misbehavior report is dependent upon the severity of the conduct involved based upon the contents of the misbehavior report, and not on any subsequent hearing or evidence adduced at such hearing. Dkt. No. 86-19 at 4.

19 at 2. Defendant Theobold ultimately designated the violations as a Tier II offense level based upon his training and professional judgment, and his belief that plaintiff's unexplained delay in arriving at the law library could potentially have posed a threat to the security to the facility, the orderly management of inmate population, and the safety of the staff and other inmates.[5] *Id.* at 2-3, 10-11. Following that designation, the matter was referred for a Tier II disciplinary hearing. Dkt. No. 86-19 at 11. Plaintiff was served with a copy of the inmate misbehavior report on May 25, 2014. Dkt. No. 86-4 at 3; Dkt. No. 86-8 at 4; Dkt. No. 86-11 at 1.

Defendant Jeffrey LaGray, a corrections lieutenant, presided over a Tier II disciplinary hearing to address the charges contained in the misbehavior report on May 28, 2014.[6] Dkt. No. 86-8 at 6; Dkt. No. 86-11. At the hearing plaintiff did not request any witnesses to testify on his behalf but argued that the misbehavior report did not provide him adequate notice of the charges to allow him to prepare a defense and

---

[5]     According to DOCCS personnel, central to the mission of the agency and its employees is the obligation to monitor inmates entrusted to its custody and to insure that they are where they are supposed to be at all times. Dkt. No. 86-18 at 4. That obligation is critical to the maintenance of safety and security of DOCCS facilities to protect both staff, inmates, and others within the facilities. *Id.*; Dkt. No. 86-4 at 11; Dkt. No. 86-19 at 7.

[6]     The record reflects, that prior to May 28, 2014, plaintiff was familiar with the disciplinary hearing process, having previously been the subject of three Tier II and one Tier III disciplinary hearings. *See* Dkt. No. 86-21 at 6.

additionally asserted that he did not receive effective assistance in

connection with the hearing. Dkt. No. 86-8 at 8-9; Dkt. No. 86-11 at 2.

Plaintiff entered a plea of not guilty to both charges. Dkt. No. 86-11 at 2.

Addressing the accusations contained in the misbehavior report, the

hearing officer and plaintiff engaged in the following colloquy:

> HO:  Okay, so why, why did you get a misbehavior
>       report on why you were 25 minutes late?
> O/F:  I wasn't 25 minutes late okay
> HO:  Well
> O/F:  I wasn't
> HO:  he says you were.
> O/F: and I wasn't. Okay
> HO:  That's your defense?
> O/F:  Ya, I wasn't Okay
> HO:  Anything else
> O/F:  Nope
> HO:  Nothing else?
> O/F:  Nothing else[.]

*Id.* After eliciting testimony from defendant LeClair, which substantiated

the allegations set forth in the misbehavior report, defendant LaGray found

plaintiff guilty as charged, and imposed a penalty that included thirty days

of cube confinement and a corresponding loss of recreation, packages,

commissary, and telephone privileges. *Id.* at 4; Dkt. No. 86-12.

Plaintiff appealed defendant LaGray's Tier II hearing determination.

Dkt. No. 86-4 at 3; Dkt. No. 86-7. As grounds for that appeal, he argued

that (1) he was not provided with employee assistance in order to permit

him to obtain documents related to the policies and procedures in place at

Bare Hill; and (2) the misbehavior report was insufficiently specific to permit him to prepare a defense. Dkt. No. 86-4 at 3-4; Dkt. No. 86-7. That appeal was assigned to defendant David Gallagher, a corrections captain at Bare Hill who, after reviewing the matter, rejected plaintiff's arguments and upheld the hearing officer's determination. Dkt. No. 86-4 at 14.

Following defendant Gallagher's denial of his appeal, plaintiff filed a special proceeding in New York State Supreme Court, Franklin County, pursuant to New York Civil Practice Law & Rules ("CPLR") Article 78, to challenge the disciplinary determination. Dkt. Nos. 86-24, 86-25; *see also* Dkt. No. 86-20 at 3. In his petition in that Article 78 proceeding, plaintiff alleged that (1) the misbehavior report issued by defendant LeClair was false; (2) the misbehavior report lacked critical information and failed to specify with particularity a factual basis for the charges; (3) plaintiff was under confinement at the time the misbehavior report was issued and denied staff assistance to prepare for the hearing; and (4) plaintiff did not violate the two rules forming the basis for the disciplinary action against him.[7] Dkt. No. 86-25.

---

[7]    In his Article 78 petition, plaintiff also argued that DOCCS prison rules 106.10, 113.28 and 180.17 are without rational basis and unconstitutional both as written and as applied. Dkt. No. 86-25 at 8. Plaintiff did not, however, include the same arguments regarding rule 109.10 or rule 109.12 – the rules he was accused of violating. *Id.*; *see also* Dkt. No. 86-29 at 7. In a reply memorandum, petitioner raised additional arguments regarding the improper designation of the charges as a Tier II infraction and discrimination. Dkt. No. 86-20 at 5; *see* Dkt. No.86-28.

Waters' Article 78 petition was denied by decision and judgment issued by Supreme Court Justice F. Peter Feldstein on February 9, 2015. Dkt. No. 86-29 at 1-7. In his decision, Justice Feldstein found that plaintiff did not qualify for a mandatory appointment of an employee assistant under the applicable regulation, 7 N.Y.C.R.R. § 251-4.1(a). Dkt. No. 86-29 at 5. The court additionally found that the misbehavior report in question satisfied the applicable standards under 7 N.Y.C.R.R. § 251-3.1, and provided sufficient information to permit the preparation of the defense. *Id.* at 6. Addressing plaintiff's constitutional claims, Justice Feldstein correctly noted that none of the rules mentioned were at issue in plaintiff's Tier II disciplinary hearing, and that their relationship to the hearing determination was "at best, speculative." *Id.* at 7.

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on or about July 1, 2015. Dkt. No. 1. An amended complaint, dated August 13, 2015, was subsequently filed with the court on October 15, 2015, and is the currently operative pleading. Dkt. No. 14. Named as defendants are Corrections Captain David Gallagher, Corrections Lieutenant David Theobald, Corrections Lieutenant Jeffrey LaGray, and Corrections Officer Thomas LeClair, all of whom are DOCCS employees assigned to work at Bare Hill. *Id.*

Following the completion of discovery, plaintiff moved on or about December 27, 2016, for the entry of summary judgment in his favor on the claims set forth in his complaint. Dkt. No. 80. On February 18, 2017, defendants submitted papers in opposition to plaintiff's motion and in support of a cross-motion seeking dismissal of plaintiff's claims on a variety of grounds. Dkt. No. 86. Plaintiff has since responded in opposition to defendants' cross-motion. Dkt. No. 96. The parties' cross-motions, which are now fully briefed, have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York  Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this

inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary

judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

In a case such as this, where the parties have filed cross-motions for summary judgment, "a court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Boy Scouts of Am. V. Wyman*, 335 F.3d 80, 88 (2d Cir. 2003) (quotation marks omitted).

B.      Procedural Due Process

In order to establish a procedural due process deprivation based upon the results of his disciplinary hearing, plaintiff must show that he possessed an actual liberty interest and was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). In their motion, defendants argue that plaintiff cannot meet the threshold test of demonstrating that through their actions, defendants deprived him of a constitutionally-significant liberty interest. Dkt. No. 86-3 at 20-21.

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest deprivation in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state

actually created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See*, *e.g.*, *LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001);[8] *Alvarez v. Coughlin,* No. 94-CV-0985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, to find that plaintiff's due process claim may proceed to trial, I must determine whether a reasonable factfinder could conclude, based on the record evidence, that plaintiff's cube confinement rose to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law.[9] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount

---

[8]     All unreported cases cited to in this report have been appended for the convenience of the *pro se* plaintiff.

[9]     In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999).

to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to undergo a detailed analysis of these considerations. *Arce*, 139 F.3d at 336; *Hynes*, 143 F.3d at 658.

As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis*, 576 F.3d at 133 (citing *Colon v. Howard*, 215 F.3d 227 (2d Cir. 2000)). Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis*, 576 F.3d at 133 (citing *Colon*, 215 F.3d at 232-33 n.5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.'" *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir.1999)).

As a result of his Tier II hearing, a penalty which included thirty days of cube confinement, the equivalent of keeplock, was imposed.[10] Dkt. No. 86-11 at 4; Dkt. No. 86-12 at 1. That period of keeplock confinement under ordinary conditions does not rise to a level sufficient to support a procedural due process claim. *See Williams v. Kane*, No. 95-CV-0379, 1997 WL 527677, at *6 (S.D.N.Y. Aug. 25, 1997) ("The decisions in the Second Circuit are unanimous that keeplock . . . confinement of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin*."); *accord, Rodriguez v. McGinnis*, 1 F. Supp. 2d 244, 248 (S.D.N.Y. 1998). Because plaintiff has failed to show that while in keeplock he was exposed to conditions significantly more harsh than those ordinarily associated with keeplock, his due process claim fails.

---

[10] "Keeplock" is a form of confinement through which an "inmate is confined to his cell, deprived of participation in normal prison routine, and denied contact with other inmates." *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989); *accord*, *Warburton v. Goord*, 14 F. Supp. 2d 289, 293 (W.D.N.Y. 1998); *Tinsley v. Greene*, No. 95-CV-1765, 1997 WL 160124, at *2 n.2 (N.D.N.Y. Mar. 31, 1997) (Pooler, J., *adopting report and recommendation by* Homer, M.J.) (citing *Green v. Bauvi*, 46 F.3d 189, 192 (2d Cir. 1995)). "The most significant difference between keeplock and general population inmates is that the former do not leave their cells for out-of-cell programs unless they are a part of mandatory educational programs and general population inmates spend more time out of their cells on weekends." *Lee v. Coughlin*, 26 F. Supp. 2d 615, 628 (S.D.N.Y. 1998).

C.    Equal Protection

In his amended complaint, plaintiff alleges that the issuance of a misbehavior report by defendant LeClair was racially motivated, and that the defendants' actions therefore deprived him of equal protection. Dkt. No. 14 at 12-13. In their cross-motion, defendants argue that the issuance of a false misbehavior report does not support a cognizable constitutional claim, and that no reasonable factfinder could conclude that plaintiff was treated differently from other similarly situated inmates based upon his race. Dkt. No. 86-3 at 21-24.

It is true, as defendants argue, that standing alone, the mere allegation that a false misbehavior report has been filed against an inmate does not give rise to a cognizable constitutional claim. *Willey v. Kirkpatrick*, 801 F.3d 51, 63 (2d Cir. 2015) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)). The Second Circuit has identified two exceptions to this general rule, including "when an inmate is able to show either (1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right." *Willey*, 801 F.3d at 63 (quotation marks omitted). That said, if plaintiff could establish that the issuance of the misbehavior report was motivated by racial animus, whether it represented a false accusation or whether it is based upon conduct for which similarly

17

situated non-African American inmates would not have been disciplined, such allegations could support a cognizable equal protection claim. *See McDowell v. Gates*, No. 06-CV-1060, 2009 WL 3055270, at *10 (N.D.N.Y. Sept. 2, 2009) (Sharpe, J., *adopting report and recommendation by Homer, M.J.*) (acknowledging potential cause of action for equal protection deprivation but finding that the plaintiff's conclusory allegations that the misbehavior report was racially motivated insufficient to establish a *prima facie* case).

The equal protection clause of the Fourteenth Amendment directs state actors to treat similarly situated persons alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To prove a violation of equal protection, a plaintiff establish that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995). The plaintiff must also show "that the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not 'reasonably related to any legitimate penological interests.'" *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (alteration omitted) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)).

Plaintiff's equal protection cause of action in this instances asserts a "class of one" claim, "where [he] alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Class-of-one equal protection plaintiffs, however, "must show an extremely high degree of similarity between [themselves] and the persons to whom they compare themselves." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006). To succeed on such a claim,

> a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

*Clubside, Inc.*, 468 F.3d at 159 (quotation marks omitted).

Ordinarily, equal protection claims are proven through circumstantial evidence because direct evidence of discriminatory animus is rarely provable. In this case plaintiff has alleged that defendant LeClair made race-based statements before issuing his misbehavior report. Dkt. No. 14 at 8. In his complaint, plaintiff alleges the following:

> LeClair escorted plaintiff out of the law library area and instead directed him to 'return your black ass back to the housing unit. Fobare told me about you. You don't arrive on colored people time. You report here after being released from the housing unit. You can complain all you want those complaints will fall on deaf ears. My family is well known in this facility.'

*Id.* Defendant LeClair denies making that statement and that the issuance of a misbehavior report was racially motivated. Dkt. No. 86-18 at 14.

Bolstering defendant LeClair's worn statements are Bare Hill prison records that dispel any notion of racial animus. Based upon a review of those records, African American inmates at Bare Hill signed in at the law library at 4:00 p.m. or later on nineteen occasions while defendant LeClair was working. Dkt. No. 86-15 at 2-4; Dkt. No. 86-18 at 12. On only one of those occasions was a misbehavior report issued, and that was to the plaintiff in this action.[11] *Id.* According to defendant LeClair, Waters was issued the misbehavior report because he arrived "unusually and noticeably late" without offering a legitimate excuse or explanation for the delay.[12] Dkt. No. 86-18 at 13.

---

[11]    Defendant LeClair explains that those other inmates were not issued misbehavior reports because they provided legitimate reasons for being late. Dkt. No. 86-18 at 12.

[12]    It is noted that, while plaintiff now claims he was late because he was stopped and searched by an unidentified corrections officer, he did not offer that excuse to defendant LeClair, nor did he assert that as a defense to the misbehavior report during the Tier II hearing. Dkt. No. 86-18 at 13; Dkt. No. 86-4 at 13; Dkt. No. 86-8 at 14.

I note further that the affidavits submitted by plaintiff in support of his equal protection claim fail to demonstrate the high degree of similarity required to give rise to an inference of discrimination. The affidavit of Thomas Hayward, for example, states that the affiant was often delayed due to random searches in arriving at the law library or other areas but was never issued a misbehavior report. Dkt. No. 96-6. Significantly, the affidavit does not demonstrate how late the inmate was, nor does it show whether he offered a legitimate excuse for being late. *Id.* Moreover, and significantly, the affidavit does not reveal inmate Hayward's race and therefore does not lend itself to an inference of discrimination. The declaration of Felix Moran is similarly lacking in critical facts that would show a high degree of similarity and give rise to a finding of racial discrimination. Dkt. No. 96-4.

Based upon the foregoing, no reasonable factfinder could conclude that defendant LeClair's issuance of a misbehavior report to plaintiff was motivated by his race and therefore represented a denial of equal protection.

I note that plaintiff also accuses defendant Theobald of charging the plaintiff with a Tier II offense based upon racial motivations, defendant LaGray for finding him guilty for similar reasons, and defendant Gallagher for affirming that determination, also based upon race. *See, e.g.,* Dkt. No.

14 at 12-16. Those allegations, however, are wholly conclusory and plaintiff offers no evidence to support them. It is well-established that mere conclusory allegations that decisions of prison officials are motivated by race are insufficient to raise a genuine issue of material fact for trial in connection with an equal protection claim. *See, e.g., Butler v. Hogue*, No. 08-CV-0264, 2010 WL 4025886, at *2 (N.D.N.Y. Oct. 13, 2010) (Sharpe, J.).

In sum, no reasonable factfinder could conclude that the defendants deprived plaintiff of equal protection based upon their actions.

IV.    SUMMARY AND RECOMMENDATION

Plaintiff asserts two claims against the defendants, who he alleges conspired among one another to violate his constitutional rights to due process and equal protection. Based upon careful review of the record now before the court, there is no evidence from which a reasonable factfinder could conclude that plaintiff was deprived of a cognizable liberty interest. His procedural due process claim therefore fails as a matter of law. Turning to the equal protection claim, based upon the record no reasonable factfinder could conclude that defendants were racially motivated in their handling of the disciplinary matter against plaintiff.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' cross-motion for summary judgment (Dkt. No. 86) be GRANTED; and it is further

RECOMMENDED that plaintiff's motion for summary judgment (Dkt. No. 80) be DENIED; and it is further

RECOMMENDED that plaintiff's amended complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[13] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

---

[13]     If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

Dated:     August 7, 2017
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

2001 WL 118598
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ramon ALVAREZ, Plaintiff,

v.

Thomas A. COUGHLIN, III, Commissioner
NYS DOCS; William Brunet, Seargent; SGT.
Davis; SGT. Emery; J. Baker, C.O.; W. Smith,
C.O.; M. Hamilton, C.O.; Mushen, C.O.; Supt.
Barkley; Nurse L. Lipscum; Thomas Farns,
C.O.; Walter Lincoln, C.O., Defendants.

No. 94–CV–985(LEK)(DRH).
|
Feb. 6, 2001.

*MEMORANDUM–DECISION AND ORDER*

KAHN, J.

 **\*1** Presently before the Court are Plaintiff's motions for
relief from judgment and for recusal of the undersigned.
For the reasons set forth below, Plaintiff's motions are
denied.

### I. BACKGROUND

Plaintiff, an inmate in the custody of the New York
State Department of Correctional Services ("DOCS"),
commenced the present 42 U.S.C. § 1983 action alleging
violations of his Constitutional Rights on August 5, 1994.
On July 18, 1993, while Plaintiff was incarcerated at
Riverview Correctional Facility, defendant Baker alleges
that she witnessed Plaintiff exposing himself to her in
the recreation yard. Plaintiff was then taken from the
yard to the infirmary by defendants Baker, Smith, and
Hamilton. In his Amended Complaint, Defendant alleges,
in relevant part, that he was there repeatedly assaulted by
defendants Davis, Smith, Mushen, and Hamilton while
defendants Liscum, Baker, and Emery stood by and
watched in violation of his Eighth Amendment rights.
Plaintiff then alleges that he was escorted to the prison's
special housing unit ("S.H.U.") and received further
physical mistreatment from defendants Emery, Mushen,
Hamilton, Smith, Farns, and Lincoln.

Plaintiff also alleges that his due process rights under the
Fourteenth Amendment were violated by the disciplinary
proceeding resulting from the incident, which was
conducted by defendant Brunet. Finally, Plaintiff alleges
that defendant Barkley participated in the violation of
these rights by failing to address Plaintiff's grievances and
by designating a biased hearing officer, defendant Brunet,
to preside over Plaintiff's Tier III hearing.

On June 14, 1999, defendants Brunet, Baker and Barkley
("Defendants") filed a motion for summary judgment
pursuant to Fed.R.Civ.P. 56. Plaintiff filed an affirmation
in opposition to Defendants' motion on June 23, 1999
and a letter response on July 6, 1999. By an Order
dated October 25, 1999, this Court granted Defendants'
motion for summary judgment and dismissed Plaintiff's
case against them in its entirety. [1] Plaintiff's current
motions for relief from judgment and recusal were filed on
November 12, 1999 and March 23, 1999, respectively.

### II. ANALYSIS

A. Relief from Judgment
Plaintiff's motion, although termed a "motion for relief
from judgment," is brought pursuant to Local Rule 7.1(g).
Accordingly, it will be treated by the Court as a motion
for reconsideration.

Motions for reconsideration proceed in the Northern
District of New York under Local Rule 7.1(g), unless
otherwise governed by Fed.R.Civ.P. 60. The "clearly
erroneous" standard of review applies to motions for
reconsideration. The moving party must "point to
controlling decisions or data that the court overlooked—
matters, in other words, that might reasonably be expected
to alter the conclusion reached by the court." *Shrader v.
CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995).

Generally, the prevailing rule in the Northern District
"recognizes only three possible grounds upon which
motions for reconsideration may be granted; they are
(1) an intervening change in controlling law, (2) the
availability of new evidence not previously available, or
(3) the need to correct a clear error of law or prevent
manifest injustice." *In re C–TC 9th Ave. P'ship,* 182 B.R.
1, 3 (N.D.N.Y.1995). Defendant does not argue that there
has been an intervening change in controlling law or the

availability of new evidence. Therefore, the basis for this motion must be that the Court made a clear error of law or needs to correct a manifest injustice. Although this Court enjoys broad discretion when making a determination to reconsider on this ground, *Von Ritter v. Heald,* 876 F.Supp. 18, 19 (N.D.N.Y.1995), it will not disregard the law of the prior case unless "the Court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1981).

### 1. *Discovery Matters*

**\*2** Plaintiff, in part, objected to Defendants' motion for summary judgment on the ground that Defendants have yet to comply with several orders by this Court compelling production. Ordinarily, Defendants' failure to comply with discovery orders would make a motion for summary judgment premature. However, in this case, the outstanding items sought by Plaintiff do not relate to the claims against the three defendants who have brought the present action.

Plaintiff points to two orders compelling Defendants to comply with his discovery requests. The first, signed on June 26, 1997, orders Defendants to provide Plaintiff with: (1) the names, identification numbers, and cell locations of all inmates that were confined in the Special Housing Unit the evening of the event; (2) copies of any witness refusal forms; (3) copies of Plaintiff's medical records from July 18, 1993 to September 27, 1993; (4) copies of medical refusal forms indicating that Plaintiff refused his medication on the day of the incident; (5) copies of any reports prepared by prison staff regarding Plaintiff's refusal to take his medication between July 18, 1993 and September 27, 1993; and (6) copies of psychiatric reports regarding Plaintiff dated July 18, 1993 to September 27, 1993. The second order, signed on January 29, 1998, requires Defendants to provide Plaintiff with clearer copies of photographs taken of Plaintiff on the day of the incident.

To the extent any of these items exist, they are not relevant to the summary judgment motion before the Court. Accordingly, the Court is free to address the summary judgment motion of these three defendants. However, if Defendants still have not produced the complained of documents and photographs, Plaintiff is free to file another motion to compel or a motion for sanctions.

### 2. *Defendant Baker*

In their motion for summary judgment, Defendants argue that Plaintiff's claims against defendant Baker are conclusory and insufficient because they do not contain specific allegations of fact indicating a deprivation of rights. *See Barr v. Abrams,* 912 F.2d 52, 56 (2d Cir.1986). Plaintiff's Amended Complaint makes mention of defendant Baker only once. Plaintiff's first cause of action alleges that:

> [t]he willful acts and omissions of defendant J. Baker constituted gross deprivation of the plaintiff's Civil Rights when J. Baker subject[ed] or caused plaintiff to be subjected to cruel and unusual punishment and failed to intervene to secure the plaintiff's health and safety.

However, Plaintiff's statement of facts does not allege that defendant Baker was present at the time of the beating or that Baker had any knowledge whatsoever of the beating.

In fact, Plaintiff's statement of facts does not mention defendant Baker at all. The statement of facts does, on the other hand, describe with specificity the involvement of a number of prison staff members, including defendant Liscum who allegedly observed the assault without taking any action to intervene, suggesting that Baker was not present at the time of the beating. Accordingly, Plaintiff's claims against defendant Baker do not contain any specific allegations of fact regarding her alleged failure to intervene and this Court was not in error when it dismissed them.

### 3. *Defendant Barkley*

**\*3** Defendants argue that Plaintiff has not alleged sufficient personal involvement on the part of defendant Barkley. In order to maintain a Section 1983 action, a plaintiff must allege direct personal involvement by the defendant in the alleged constitutional deprivation. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (1994). Liability may not be based on respondeat superior or vicarious liability. *See Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989).

Supervisors may be held liable for personal involvement when they: (1) are directly involved in the alleged events; (2) fail to rectify a constitutional violation after being notified of the situation; (3) create or allow to continue a policy of unconstitutional practices; or (4) commit gross negligence in supervising the individuals responsible for the constitutional violations. *See Wright,* 21 F.3d at 501.

Here, Plaintiff's complaint baldly alleges that defendant Barkley failed to address Plaintiff's grievance complaint and appointed a biased hearing officer to conduct Plaintiff's disciplinary hearing. Plaintiff does not make any specific factual allegations regarding defendant Barkley's involvement in his case. Plaintiff's statement of facts fails to allege facts establishing that Barkley ever reviewed his grievance. Indeed, Plaintiff's own exhibit reveals that Harlan W. Jarvis, Jr., Acting Superintendent, rather than defendant Barkley, reviewed Plaintiff's grievance. Moreover, an exhibit introduced by Defendants, and not contradicted by Plaintiff, shows that Mr. Jarvis also appointed the hearing officer for Plaintiff's disciplinary hearing.

"It is not enough to allege that officials failed to carry out the duties of their office without defining these duties or how each individual failed to meet them." *Thomas v. Coombe,* No. 95 Civ. 10342, 1998 WL 391143, at [*]5–[*]6 (S.D.N.Y. July 13, 1998) (citing *Beaman v. Coombe,* No. 96 Civ. 3622, 1997 WL 538833, at [*]3 (S.D.N.Y. Aug. 29, 1997), *aff'd in relevant part* No. 97–2683, 1998 WL 382751, at [**]1 (2d Cir. May 13, 1998)). Because Plaintiff's claim against defendant Barkley fails to allege with sufficient specificity his personal involvement in the alleged constitutional violations, it was properly dismissed by the Court.

### 4. *Defendant Brunet*

Plaintiff alleges that defendant Brunet violated his Due Process rights under the Fourteenth Amendment in the conduct of his disciplinary hearing. Defendants argue that (1) Plaintiff's claim is barred by the Supreme Court decision in *Sandin v. Conner,* 515 U.S. 472 (1995), because Plaintiff has not alleged that he had a protected liberty interest; (2) Plaintiff was nevertheless accorded all of the process due under *Wolff v. McDowell,* 418 U.S. 539 (1974); and (3) defendant Brunet is protected by qualified immunity in any event. [2] In order to establish a due

process violation, a defendant must "prove that the state has created a protected liberty interest and that the process due was denied." *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)).

#### a. *Protected liberty interest*

**\*4** In *Sandin,* the Supreme Court considered whether prisoners have a protected liberty interest entitling them to due process in disciplinary proceedings and held that such interests "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prisoner life." *Sandin,* 515 U.S. at 483–84. Following the *Sandin* decision, the Second Circuit held that, in order for a liberty interest to be protectable, a plaintiff "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin,* and that the state has granted inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

##### i. Atypical and significant hardship

The Second Circuit has repeatedly held that, in determining whether a liberty interest has been affected, a district court is required to undertake extensive fact-finding regarding both the length and conditions of confinement and make specific findings in support of its conclusions. *See, e.g., Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir.1997); *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997); *Sealey v. Giltner,* 116 F.3d 47, 51–52 (2d Cir.1997); *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998). The Second Circuit makes clear that it is not enough to look at the length of time a prisoner has been confined to SHU in determining whether he has a liberty interest. *Brooks,* 112 F.3d at 49. Instead, courts must also make a factual finding as to the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population. *Id.* (citing *Miller,* 111 F.3d at 8–9).

However, in *Hynes v. Squillance,* 143 F.3d 653 (2d Cir.1998), the Second Circuit held that, "in cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, the district court need not provide such detailed explanation

of its reasoning." *Id.* at 658. There, the plaintiff offered no evidence in support of his argument that his 21–day confinement was atypical or significant to contradict the defendants' submission showing that the conditions of confinement were typical. *See id.* The ruling was explicitly limited, however, to cases involving shorter periods of segregated confinement. *See id.* The Court held that the decisions in *Miller, Brooks,* and *Wright* all required specific factual findings because they "involved relatively long periods of confinement." *Id.; see also Spaight v. Cichon,* No. 98–2537, 1998 WL 852553, at *2 (2d Cir. Dec 8, 1998) (holding that a 39–day confinement was not so short as to be subject to dismissal under *Hynes* without further analysis); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (advising district courts to develop a detailed factual record for cases involving segregated confinement of between 101 and 305 days in lenght). The plaintiff in *Miller,* for example, was subject to disciplinary segregation for 125 days. *See Miller,* 11 F.3d at 7.

**\*5** In this case, Plaintiff was subject to 120 days in disciplinary segregation, much closer to the period of confinement in *Miller* than that in *Hynes.* Accordingly, the Court may not rely on the length of Plaintiff's confinement alone and must undertake a detailed factual finding regarding the conditions of Plaintiff's confinement as compared to other forms of segregated confinement and to the general population of inmates.

To establish that Plaintiff's confinement was not atypical and significant, Defendants put forth the affidavit of Mr. Donald Selsky, Director of the Special Housing/ Inmate Disciplinary Program. However, Selsky's affidavit discusses the special housing program on a statewide basis in comparison to general population policies statewide, but acknowledges that conditions differ from facility to facility. The affidavit also includes a variety of statistics regarding SHU confinement establish, including the fact that 19,983 of the 215,701 inmates (9.26%) in the prison system between 1991 and 1996 were penalized with SHU confinement and that 17,302 of those received terms up to one year (85.17%). It does not, however, provide any evidence regarding the specific conditions of Plaintiff's confinement.

This leaves the Court with insufficient evidence with which to compare Plaintiff's conditions of confinement to other forms of segregated confinement and to the general population. If such a generalized showing by

the government regarding the typicality of segregated confinement was satisfactory, then there would be no need for the specific factual findings required in each case by the Second Circuit.

Indeed, in *Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1994), the Second Circuit held that a district court's reliance on the percentage of the prison population receiving punitive terms of segregated confinement and the percentage of that group receiving terms similar in length to that of the plaintiff was inappropriate. *See id.* at 394. The Court held that

> [t]he theory of *Sandin* is that, notwithstanding a mandatory entitlement, a deprivation is not of sufficient gravity to support a claim of violation of the Due Process Clause if similar deprivations are typically endured by other prisoners, not as a penalty for misbehavior, but simply as the result of ordinary prison administration.

*Id.*

A comparison between the duration of a plaintiff's SHU confinement and the SHU terms received by other inmates who were convicted of misbehavior "does not tell whether [the plaintiff's] deprivation was more serious than typically endured by prisoners as an ordinary incident of prison life." *Id.* Likewise, the court held that punitive terms in SHU

> are not a 'normal incident' for a prisoner whose wrongdoing must be established according to due process standards if the consequence of an adverse finding is confinement in atypical conditions of severe hardship. How many prisoners receive such terms as punishment for misbehavior does not measure how likely a prisoner is to suffer comparable deprivation in the ordinary administration of the prison.

**\*6** *Id.* Moreover, the Court expressed doubt that, even if such a statistic was held to be relevant, the fact that

10% of prisoner were subject to terms in SHU made such confinement typical. *See id.* at 394 n.2.

As the record before the Court is not sufficient to determine whether Plaintiff's confinement was an atypical and significant hardship, summary judgment at this time is inappropriate.

### ii. State created liberty interest

Defendants also argue the second prong of the *Frazier* test, requiring Plaintiff to establish the existence of a state-created liberty interest in remaining free from segregated confinement, has not been satisfied. Defendants contend that no New York law grants prisoners the right to be free from segregated confinement.

Defendants argue that previous Second Circuit precedent establishing the existence of such a state-created interest, *see, e.g., Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984), does not survive the Supreme Court's decision in *Sandin.* However, *Sandin* does not effect the validity of these decisions. *See Ramirez v. McGinnis,* 75 F.Supp.2d 147, 153 (S.D.N.Y.1999) (holding that *Sandin* "simply limits due process protection to hardships that are also 'atypical and significant' ") (citing *Gonzalez v. Coughlin,* 969 F.Supp. 256, 257 (S.D.N.Y.1997); *Wright v. Miller,* 973 F.Supp. 390, 395 (S.D.N.Y.1997); *Lee v. Coughlin,* 26 F.Supp.2d 615, 632–33 (S.D.N.Y.1998)). Accordingly, New York State regulations do create a protected liberty interest in remaining free from disciplinary segregation.

### b. *Process Due*

Defendants next urge the Court to find that, even if Plaintiff was entitled to due process protections, he was afforded the necessary procedural protections at his hearing. In a conclusory fashion, Defendants argue that Plaintiff "received advance notice of the charges, called witnesses at the hearing, and testified on his own behalf."

When charged with a disciplinary infraction that could lead to loss of good-time credits or to confinement in SHU, a prisoner is entitled to "at least the minimum requirements of procedural due process appropriate for the circumstances." *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974); *see Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993) (citing *McCann v. Coughlin,* 698 F.2d 112, 121 (2d Cir.1983)). This requires, among things, that the prisoner be given advance notice of the charges against him and a meaningful opportunity to marshall and present evidence in his defense, which includes the right to "call witnesses and present evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff,* 418 U.S. at 563, 566.

Plaintiff specifically argues that defendant Brunet denied him due process by, among other things, disregarding his complaints regarding the confiscation of his trial materials and refusing to allow him to present an eye witness who would testify that Plaintiff was beaten by several of the defendants. The requirement that a prisoner be given advance notice of the charges against him is "no mere formality." *Benitez,* 985 F.2d at 665. Such "notice must be 'written ... in order to inform [the inmate] of the charges and to enable him to marshall the facts and prepare a defense.' " *Id.* (quoting *Wolff,* 418 U.S. at 564). Moreover, the prisoner must be given the notice no less than 24 hours before the hearing and be permitted to retain the notice for at least 24 hours. *See Benitez,* 985 F.2d at 665–66.

**\*7** Here, Plaintiff alleges that his litigation papers were all confiscated from him by the guards in the SHU and that, when he complained of these actions to defendant Brunet, his concerns were ignored. Confiscation of a prisoner's papers made in preparation for a hearing, particularly the notice of charges, significantly hampers the prisoner's ability to prepare his defense. Defendants do not address Plaintiff's allegation in their papers. Accordingly, summary judgment is not appropriate on this ground.

A prisoner is also given the right to call and present witnesses in his defense at a disciplinary hearing. *See Ponte v. Real,* 471 U.S. 491, 495 (1985) (citing *Wolff,* 418 U.S. at 566)). This right is not absolute, however, as prison officials must be allowed "discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority." *Wolff,* 418 U.S. at 566; *see also Ponte,* 471 U.S. at 496 (suggesting that prison officials may also deny a witness request on grounds of irrelevance or lack of necessity). However, "a hearing official has a duty to articulate an explanation for the decision to exclude a witness." *Rivera v. Coughlin,* No. 92 Civ. 3404, 1994 WL 263417, at \*6 (S.D.N.Y. June 13, 1994).

In this case, Plaintiff alleges that he requested the presence of an eye-witness to the events in question but that defendant Brunet did not allow it. The transcript to the hearing reveals that Brunet informed Plaintiff that he could not contact the witness because he could not contact the witness and the hearing had to be finished that day.

Defendants have not argued, much less established, that these were reasonable limits placed on the hearing by Brunet. Moreover, Defendants have not presented any evidence or argued that allowing the witness' testimony would have been "unduly hazardous to institutional safety" or create a "risk of reprisal or undermine authority." Defendants do not even argue the validity or importance of those reasons set forth by defendant Brunet at the hearing. Finally, it is clear that the proposed evidence in this case was not irrelevant or unnecessary. Accordingly, genuine issues of material fact exist which prevent a finding of summary judgment at this time.

### c. *Qualified Immunity*
Finally, relying solely on their prior arguments, Defendants contend that defendant Brunet is protected by qualified immunity. The doctrine of qualified immunity protects a Section 1983 defendant from liability for damages if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Defendants are further protected from liability where the rights are clearly established if it was objectively reasonable to believe that their actions did not violate those rights. *See Anderson v. Creighton,* 483 U.S. 635, 638 (1987).

**\*8** The officials do not have such immunity, however, where the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. In determining whether a particular right was clearly established at the time of the alleged violation, courts should consider:

> (1) whether the right in question was defined with "reasonable specificity;" (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3)

> whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991).

In this case, Plaintiff's right to notice and to present witnesses were clearly established and well defined at the time of the hearing, July 22, 1993. Although, prior to 1993, it was not entirely clear whether a prisoner was entitled to keep his notice for at least 24 hours, *Benitez* clarified that this was so on February 3, 1993. Therefore, it was not objectively reasonable for defendant Brunet to leave unanswered Plaintiff's complaint that his litigation papers were confiscated.

Also, the right to present witnesses at a disciplinary hearing and the limitations on that right were well defined prior to the time of the hearing. Whether the rationale offered by defendant Brunet for excluding the witness, the difficulty in locating the witness and the need to complete the hearing that day, are sufficient justification to support his qualified immunity defense are material issues of fact which cannot be resolved on a motion for summary judgment. *See Rivera,* 1994 WL 263417, at *6. Accordingly, summary judgment may not be granted on this ground.

In light of these holdings, it is evident that this Court made a clear error of law and that reconsideration is appropriate as to Plaintiff's claims against defendant Brunet.

### B. Recusal
Plaintiff's motion for recusal is based on 28 U.S.C. § 455(a), which states that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *Id.* Importantly, it does not matter whether the judge is in fact subjectively impartial, only whether the objective facts create the appearance of impartiality. *United States v. Bayless,* 201 F.3d 116, 126 (2d Cir.2000); *Hughes v. City of Albany,* No. 98–2665, 1999 WL 709290, at **2 (2d Cir. July 1, 1999). "The ultimate inquiry is whether 'a reasonable person, knowing all the facts, would conclude that the trial judge's impartiality could reasonably be questioned." ' *Hughes v. City of Albany,* 33 F.Supp.2d 152, 153 (N.D.N.Y.1999)

(quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992)); *see Bayless,* 201 F.3d at 126.

In this case, Plaintiff's claim is based on the congregation of a number of the Court's rulings and the overall handling of his case. The Supreme Court has held, however, that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States,* 510 U.S. 540, 555 (1994); *see Hughes,* 1999 WL 709290, at **2. Indeed, the Second Circuit has held that "opinions formed by a judge on the basis of facts introduced or events occurring in the course of judicial proceedings do not constitute a basis for recusal unless they indicate that the judge has a 'deep-seated favoritism or antagonism that would make fair judgment impossible.' " *United States v. Diaz,* 176 F.3d 52, 112 (2d Cir.1999) (quoting *Liteky,* 510 U.S. at 555). Plaintiff has put forth nothing, and a review of the record reveals nothing, which would suggest to an objective observer that the Court has a deep-seated favoritism for Defendants or any antagonism against Plaintiff. Therefore, his motion is denied.

## III. CONCLUSION

**\*9** ORDERED that Plaintiff's motion to vacate is GRANTED in part and DENIED in part consistent with the terms of this opinion;

ORDERED that Plaintiff's claim against defendant Brunet be REINSTATED and the judgment dismissing the case in defendant Brunet's favor be VACATED;

ORDERED that Plaintiff's motion for recusal is DENIED; and it is further

ORDERED that the clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2001 WL 118598

---

Footnotes

1    Also still pending before the Court is a motion for summary judgment filed by Plaintiff September 1, 1998. The motion was originally dismissed by the Court's Order adopting the Report–Recommendation of United States Magistrate Judge David R. Homer, which held that the motion was untimely and, in the alternative, that it failed on the merits. Then, by an Order dated June 1, 1999, the Court vacated its previous order and held that Plaintiff's motion would be addressed on the merits, along with Defendants' motion for summary judgment. However, Judge Homer's Report–Recommendation did address the merits of Plaintiff's motion. The Court has undertaken a de novo review of the record and has determined that Plaintiff's motion should be dismissed for the reasons discussed in the Report–Recommendation.

2    Defendants also argue in their brief that Plaintiff's claim is barred by the Supreme Court decisions in *Heck v. Humphrey,* 512 U .S. 477 (1994), and *Edwards v. Balisok,* 520 U.S. 641 (1997). Following the filing of Defendants' brief, however, the Second Circuit held that a Section 1983 suit "challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by *Heck* and *Edwards." Jenkins v. Haubert,* 179 F.3d 19, 27 (2d Cir.1999). Because Plaintiff's complaint challenges the conditions of, as opposed to the fact or duration of his confinement, the *Heck* and *Edwards* decisions are not applicable.

---

End of Document                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 4025886
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Keith Terrell BUTLER, Plaintiff,
v.
J. HOGUE, Correction Officer, Upstate Correctional
Facility; and J. Hyde, Correction Officer,
Upstate Correctional Facility, Defendants.

No. 9:08–cv–264 (GLS/DRH).
|
Oct. 13, 2010.

**Attorneys and Law Firms**

Keith Terrell Butler, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, New York State Attorney
General, Adele M. Taylor–Scott, Assistant Attorney
General, Albany, NY, for the Defendants.

*MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, District Judge.

### I. *Introduction*

**\*1** Plaintiff Keith Terrell Butler, an inmate at Clinton
Correctional Facility, brings this action under 42 U.S.C. §
1983 against defendants J. Hogue and J. Hyde. (Compl.,
Dkt. No. 1.) Butler alleges that during his incarceration at
Upstate Correctional Facility, Hyde and Hogue violated
his First, Eighth, and Fourteenth Amendment rights
by serving Butler a contaminated kosher meal on one
occasion and soup in a defective container the following
day. (*Id .; see also* Pl. Objections, Dkt. No. 48.) Butler
moved for summary judgment and Hogue and Hyde
cross-moved for judgment on the pleadings. (Dkt.Nos.36,
40.) On February 4, 2010, Magistrate Judge David R.
Homer issued a Report and Recommendation Order
(R & R) recommending that Butler's motion be denied,
that Hogue and Hyde's cross-motion for judgment on
the pleadings be converted into a cross-motion for
summary judgment, and that the cross-motion be granted,
dismissing Butler's complaint in its entirety. (Dkt. No. 46.)
Pending are Butler's objections to the R & R. (Dkt. No.

48.) For the reasons that follow, the R & R is adopted in
its entirety.

### II. *Standard of Review*

Before entering final judgment, this court routinely
reviews all report-recommendations in cases it has referred
to a magistrate judge. If a party has objected to
specific elements of the magistrate judge's findings and
recommendations, this court reviews those findings and
recommendations de novo. *See Almonte v. N.Y. State
Div. of Parole,* No. 04–cv–484, 2006 WL 149049, at *6–
7 (N.D.N.Y. Jan. 18, 2006).* In those cases where no
party has filed an objection, or only a vague or general
objection has been filed, this court reviews the findings and
recommendations of a magistrate judge for clear error. *See
id.*

### III. *Discussion*

Based on Butler's submission of various documents
outside the pleadings in support of his summary judgment
motion and defendants' consequent reference to and
reliance on those documents, Judge Homer recommended
that Hogue and Hyde's Rule 12(c) cross-motion to dismiss
be converted into a motion for summary judgment. (*See*
R & R at 5, Dkt. No. 46.) Hogue and Hyde raise no
objections to the R & R or the conversion of their motion.
The court finds no error in this conversion.

Butler raises no objection to Judge Homer's conclusion
that any infringement on his First Amendment rights was
de minimis and that Butler's complaint therefore fails to
state any First Amendment claim as to which relief can be
granted. (*Id.* at 7–9.) The court concurs in that conclusion.
Butler also does not protest the denial of his motion to
amend his statement of material facts. (*Id.* at 2 n. 3.)
Because no reason was given for the request, the court
affirms the denial of the motion.

Construing Butler's objections liberally, they specifically
challenge Judge Homer's conclusion that his Eighth
and Fourteenth Amendment rights were not violated.
Consequently, those conclusions must be reviewed de
novo. Insofar as the court can consider the challenges
without straying too far from the documents provided
prior to the filing of the objections, Butler's arguments

are without merit. The objections themselves contain new information relating to Butler's medical condition of diabetes, previously unmentioned and not suggested by the submissions, which this court declines to consider for the first time at this late stage. (*See* Pl. Objections at 2, Dkt. No. 48.) Although a district court has the option to "receive further evidence" when reviewing a magistrate judge's report and recommendation de novo, the court will not do so unless the presenting party offers a sufficient justification for admission. FED. R. CIV. P. 72(b)(3); *see Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.1999) ("[W]e have upheld the exercise of the district court's discretion in refusing to allow supplementation of the record upon the district court's de novo review." (italics omitted)). Plaintiff has offered no justification for the delay in presenting this evidence and thus the court declines to consider this new claim.

**\*2** Butler raises other additional, and more recent, allegations in his objections. He claims, for example, that he has been retaliated against, that his legal files were stolen, and that he was beaten by correction officers on December 30, 2009. (*See* Pl. Objections at 2–3, Dkt. No. 48.) Again, these claims are beyond the scope of the present cause of action and will not be addressed here.

### A. *Fourteenth Amendment Claims*

Turning to Butler's Fourteenth Amendment due process claims, the R & R observes that it is "unclear how Butler determined that his Fourteenth Amendment rights have been violated." (R & R at 2, Dkt. No. 46.) Whatever the claim's genesis, Judge Homer correctly determined that even taking as true all Butler's pleaded facts and all reasonable inferences drawn therefrom, Butler cannot show that his due process or equal protection rights have been violated and that he is entitled to judgment as a matter of law.

In order for a prisoner to show that his procedural due process rights have been violated, he must first establish that he possessed a protected liberty interest in avoiding the hardship. *See Sandin v. Conner,* 515 U.S. 472, 484 (1995). To show a protected liberty interest, a prisoner must show that the alleged harm "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* Butler has pleaded no facts and benefits from no inferences that meet the significant hardship requirement. The absence of any viable liberty interest at stake also compels the conclusion

that Hogue and Hyde are entitled to judgment as a matter of law.

The court further notes that Butler can have no substantive due process claim independent of his Eighth Amendment claims. Where there is an explicit textual source of constitutional protection relevant to a claim, that source, rather than substantive due process, governs the analysis. *Graham v. Connor,* 490 U.S. 386, 395 (1989); *see also County of Sacramento v. Lewis,* 523 U.S. 833, 842–843 (1998). In light of Butler's incarceration, any substantive due process claim would be subsumed in the Eighth Amendment claims present in Butler's submissions.

Butler's Fourteenth Amendment equal protection claims fare no better than his due process claims. To establish an equal protection claim, a plaintiff must show that "he was treated differently from others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (citation omitted). As the R & R points out, nowhere in Butler's submissions is there any evidence of how other similarly-situated inmates were treated with regard to either medical care or the regularity of the provision of meals. At best, Butler can point to one sentence in his affidavit in support of his motion for summary judgment: "plaintiff is entitled to The Equal protection Clause in which I am intentionally being treated differently." (Pl. Mot. at 3, Dkt. No. 36.) This conclusory allegation is insufficient to salvage his equal protection claim. Consequently, Butler's Fourteenth Amendment equal protection claims fail.

**\*3** B. *Eighth Amendment Claims*

Butler objects to the dismissal of his Eighth Amendment claims. Disregarding those objections which present new evidence, his remaining objections are wholly without merit. Butler's submissions prior to his objections contain no allegations that he suffered any physical injury, of any magnitude, as a consequence of the deprivation of the meals. Thus, Butler relies in error on *Hudson v. McMillian,* 503 U.S. 1 (1992). Although *Hudson* rejects a bright-line minimum amount of force required to show excessive force, it also holds that de minimis force fails to establish a constitutional claim unless the particular use of force is "repugnant to the conscience of mankind." *Id.* at 10 (citation and internal quotation marks omitted). Because no physical force or injury is

even alleged, no claim based upon excessive force can be sustained. As the R & R rightly points out, "allegations of verbal harassment alone, without physical injury, are not actionable pursuant to § 1983." (R & R at 10, Dkt. No. 46 (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1996)).)

Butler's pleadings do not support an Eighth Amendment claim for medical indifference. To establish such a claim, "a plaintiff must prove that the defendant was deliberately indifferent to a serious medical need." *Sledge v. Kooi,* 564 F.3d 105, 108 (2d Cir.2009) (citing *Farmer v. Brennan,* 511 U.S. 825, 834–40 (1994)). No evidence of a serious medical need exists in the submissions under review. The properly pleaded facts bear out, at most, a chronic sore throat for which Butler was provided medical treatment on nine separate occasions in the month that followed the provision of the contaminated meals. (*See* Pl. Mot. at 12–16, Dkt. No. 36.) Even if a reasonable jury could find that Butler's sore throat met the serious medical condition requirement, the requisite mental state of deliberate indifference is clearly absent. First, a defendant must "know of and disregard[ ] an excessive risk" to the plaintiff's health or safety. *Farmer,* 511 U.S. at 837. There is no evidence or allegation in Butler's submissions that either defendant was aware of Butler's medical conditions. Consequently, Butler's Eighth Amendment medical indifference claim fails.

Butler also claims an Eighth Amendment violation due to unsanitary prison conditions stemming from a failure to provide nutritious food. (*See* Pl. Mot. at 3, 5, Dkt. No. 36.) Prisons are required under the Eighth Amendment to provide for the basic human needs of those incarcerated, including "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (per curium) (citation and internal quotation marks omitted). The deprivation must be sufficient to create a serious danger to the health of the inmate. *See, e.g., Beckford v. Portuondo,* 151 F.Supp.2d 204, 213 (N.D.N.Y.2001) (finding deprivation of two

of three meals per day for eight days created an issue of material fact sufficient for Eighth Amendment claim to survive summary judgment); *Moss v. Ward,* 450 F.Supp. 591, 596–597 (W.D.N.Y.1978) (finding denial of food for four consecutive days and reduced food for three days thereafter sufficient to violate prisoner's Eighth Amendment rights). Where a particular diet is medically required, denial of a smaller number of meals may be sufficient in some circumstances. *See Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) (citing *Robles,* 725 F.2d at 15–16). However, the scope of the deprivation of food required to constitute cruel and unusual punishment is significantly greater than the deprivation present here. Deprivation of only two meals over a two-day period is insufficient to make out a constitutional claim. Therefore, the Eighth Amendment claims based on denial of sanitary food fails.

### IV. *Conclusion*

**\*4 WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge David R. Homer's February 4, 2010 Order (Dkt. No. 46) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Hogue and Hyde's motion (Dkt. No. 40) is **GRANTED** in all respects and the complaint dismissed; and it is further

**ORDERED** that Bulter's motion (Dkt. No. 36) is DENIED; and it is further

**ORDERED** that the Clerk provide copies of this Memorandum–Decision and Order to the parties.

### IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 4025886

---

2001 WL 1658245
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Mark LABOUNTY, Plaintiff,

v.

Philip COOMBE, Jr., Wayne Strack,
and Donald Selsky, Defendants.

No. 95 CIV 2617(DLC).
|
Dec. 26, 2001.

**Attorneys and Law Firms**

Mark LaBounty, Pro Se, Marcy Correctional Facility,
Marcy, for Plaintiff.

Michael J. Keane, Assistant Attorney General, Office of
the Attorney General of the State of New York, New
York, for Defendants.

OPINION AND ORDER

COTE, District J.

**\*1** On April 17, 1995, Mark LaBounty ("LaBounty"),
who is presently incarcerated at Marcy Correctional
Facility, brought this action *pro se* pursuant to 42 U.S.C.
§ 1983 ("Section 1983"), alleging that the defendants
violated his constitutional rights while he was an inmate at
Fishkill Correctional Facility ("Fishkill"). On November
25, 1996, the Court granted in part the defendants' motion
to dismiss. On February 5, 2001, the Court of Appeals
for the Second Circuit vacated in part the November 25,
1996 decision, and remanded LaBounty's procedural due
process claim for further development. [1] This claim stems
from LaBounty's wrongful confinement in "SHU" for 30
days, a claim that this Court had dismissed for failure to
identify a violation of a liberty interest. After discovery,
defendants now move for summary judgment. For the
reasons set forth below, the motion is denied.

BACKGROUND

LaBounty's allegations against the defendants are fully
described in the Court's November 25, 1996 Opinion,

familiarity with which is presumed. *LaBounty v. Coombe,
et al.,* No. 95 Civ. 2616, 1996 WL 684168 (S.D.N.Y.
Nov. 25, 1996). Here, the Court only describes those facts
necessary for the purposes of this motion. [2]

By Order dated February 13, 2001, the Court described
the issues remanded by the Court of Appeals for further
development as follows:

1. The plaintiff's procedural due process claim that
the disciplinary hearing held on January 23 and 27,
1995 was delayed, that witnesses at that hearing
were examined outside his presence, and that Vuturo
prejudged the merits of the hearing.

2. Whether plaintiff's due process rights were violated
while he was in SHU during the period beginning on
January 27, 1995, by

(a) a denial of medication for his ear infection;

(b) the prescription of Flexeril for a back condition;

(c) Nurse Rivera substituting his back pain medication
with an unknown drug which caused him dizziness and
head and stomach aches;

(d) a denial of paper and pencils;

(e) a denial of out-of-cell exercise;

(f) a denial of access to library books;

(g) not being permitted to mail letters in the evening;
and

(h) the censorship or destruction of his mail, legal
documents, and personal papers.

3. Whether, under *Sandin v. Conner,* 515 U.S. 472
(1995) and its progeny, the plaintiff has a liberty interest
sufficient to bring the due process claims described in
items 1 and 2.

The parties were ordered to inform the Court if they had
any other understanding of the Court of Appeals' Order
of remand.

By letter dated February 27, 2001, the defendants agreed
that the February 13, 2001 Order correctly described the
remanded issues. By letter dated February 17, 2001, the
plaintiff also agreed with the description of the issues, but

indicated a wish to add three additional issues. By Order dated February 28, 2001, the Court found that the issues remanded for further development were those described in the February 13, 2001 Order.

**\*2** The following facts are undisputed or as shown by the plaintiff unless otherwise noted. On January 12, 1995, LaBounty went to the clinic at Fishkill to renew his prescriptions for hypertension medication, and to complain of an ear infection. On that day, Nurse Ronald Waller issued an "Inmate Misbehavior Report" against him, which included the charge of refusing a direct order. Also on that day, Robert L. Macomber issued a "Inmate Misbehavior Report" against LaBounty, which included the charge of possessing outdated medications in his cell.

*Tier III Hearing*

On January 23 and 27, 1995, hearing officer Joseph Vuturo ("Vuturo") conducted a "Tier III" disciplinary hearing to address the charges against plaintiff.[3] On January 27, Vuturo found LaBounty guilty of violating a direct order and possessing outdated medications. Vuturo sentenced LaBounty to 90 days of segregated confinement in the Special Housing Unit ("SHU"), of which 60 days were suspended. LaBounty served 30 days in SHU, beginning on January 27, 1995.

On January 27, 1995, LaBounty appealed his conviction to the Commissioner of the Department of Correctional Services ("DOCS"). On March 22, 1995, the DOCS Director of the Special Housing / Inmate Disciplinary Program, defendant Donald Selsky ("Selsky"), reversed LaBounty's conviction on the charge of possessing outdated medication because the "[m]isbehavior report fail[ed] to support [the] charge." On February 6, 1996, Selsky "administratively reversed" plaintiff's conviction on the only remaining charge-disobeying a direct order-"due to off-the-record communication used as evidence in hearing." Selsky directed that any records containing references to the January 27, 1995 hearing be expunged.

*SHU Conditions*

The SHU regulations provide that, while in SHU, inmates are confined to their cells for 23 hours a day, and are permitted to leave their cells for recreation, visits to the medical department, legal visits, guidance or counselor interviews, and for showers two times per week. SHU

may be imposed for disciplinary and non-disciplinary, or administrative, reasons. Between January 1, 1991 and December 31, 1996, 162,601 of the 215,701 inmates in the New York correction system received "confinement sanctions." 106,265 inmates were penalized by "keeplock" confinement. In 1993, 4.2% of the inmates in DOCS' confinement were sentenced to SHU, and in 1994, 4.8% were sentenced to SHU.

*Plaintiff's Experience in SHU*

While in SHU, LaBounty was deprived of all of the pain medication which had been prescribed for "constant severe pain related to his spinal condition,"[4] as well as medication for an ear infection. LaBounty complained to defendant Nurse Rivera and to other medical staff that he was not receiving his pain medication and that he was suffering from an ear infection, but he received no response from them. On February 13, 1995, LaBounty was prescribed "Flexeril" by a physician's assistant, but LaBounty claims the medicine was merely prescribed as a "pretext" and that it did not help his severe pain or his ear infection. LaBounty was in "constant severe pain for the duration of his 30-days in SHU." LaBounty was not treated for his ear infection until he was released from SHU and given a CAT Scan. The CAT Scan revealed that the ear infection had become "Mastoiditis." As a result of the untreated ear infection, LaBounty lost the hearing in his right ear.

**\*3** While he was in SHU, LaBounty was prescribed one refill of his hypertension medication. A nurse gave the refill to officers, but the officers refused to give plaintiff his medication. After LaBounty repeatedly threw his bed against the cell door, the SHU evening supervisor came to his cell and later ordered the SHU officer to give LaBounty his medication.

While he was in SHU, LaBounty was deprived of any "out-of-the-cell exercise," which he requested each day. He was given only two showers during his 30 days in SHU, and each shower was only one to two minutes long. He requested a pen from the SHU officer in order to write his appeal to the Commissioner, and the officer refused. Plaintiff later received a pen from the "porter."[5] Plaintiff requested other writing materials from the officers, but they did not give him any. LaBounty received all of his writing materials from the porter and other inmates when they were let out for exercise. Before he was released from

SHU, the officers opened LaBounty's "property bags" and "removed legal material relevant to this case and other pending cases." LaBounty was refused books and newspapers while he was in SHU despite requesting them.

## DISCUSSION

Summary judgment may not be granted unless the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The substantive law governing the case will identify those issues that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1987). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the nonmoving party. *See Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994). When the moving party has asserted facts showing that the nonmovant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Rule 56(e), Fed.R.Civ.P. *See also Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). In deciding whether to grant summary judgment, this Court must, therefore, determine (1) whether a genuine factual dispute exists based on the evidence in the record, and (2) whether the facts in dispute are material based on the substantive law at issue.

Where, as here, a party is proceeding *pro se,* this Court has an obligation to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Nonetheless, a *pro se* party's "bald assertion," completely unsupported by evidence, is insufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### A. *Protected Liberty Interest*

*\*4* A claim for procedural due process violations requires a determination of "(1) whether the plaintiff had a protected liberty interest in not being confined and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Tellier v. Fields,*-F.3d-, 2001 WL 457767, at \*7 (2d Cir. Nov. 1, 2000) (errata filed Apr. 26, 2001) (citation omitted). After the Supreme Court's decision in *Sandin v. Connor,* 515 U.S. 472 (1995), a determination that there is a liberty interest also requires a two-part analysis. *Tellier,*-F.3d-, 2001 WL 457767, at \*7. " 'As a result of *Sandin,* a prisoner has a liberty interest only if the deprivation is atypical and significant and the state has created the liberty interest by statute or regulation.' " *Id.* (citation omitted).

### *Atypical and Significant Hardship*

The defendants argue that LaBounty does not have a protected liberty interest because his confinement in SHU was not atypical or significant. To determine whether the conditions of a particular confinement impose an "atypical and significant hardship" one must undertake a factual analysis. *Id.* "The circumstances that the court must examine include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions....' " *Sims v. Artuz,* 230 F.3d 14, 22 (2d Cir.2000) (citation omitted). It is clear that "[c]onfinement in SHU may impose hardships that are atypical or significantly different from the burdens of ordinary prison confinement." *Id.* " 'The content of the *Sandin* standard of 'atypical and significant hardship' is an issue of law, but if the facts concerning the conditions or the duration of confinement are reasonably in dispute, the jury (where one is claimed) must resolve those disputes and then apply the law of atypicality, as instructed by the Court." ' *Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (citation omitted).

Material issues of fact exist as to whether LaBounty's confinement in SHU was "atypical" as compared to the conditions of other inmates in both administrative confinement and in the general population. As noted above, LaBounty asserts that while he was in SHU, he was denied medication and medical treatment, writing materials, books, and exercise.[6] If proven true, these conditions would appear to be atypical when compared to the conditions of confinement not only of inmates in administrative confinement and in the general population, but also of other inmates in punitive segregation. *See* N.Y.

Comp.Codes R. & Regs. tit. 7, § 304.1 *et seq.; Colon,* 215 F.3d at 230 (stating that "normal conditions of SHU confinement in New York" include one hour of exercise per day, two showers a week, and a limited number of books). LaBounty further asserts that the conditions in SHU caused him significant hardship in a number of ways, including severe physical pain and the loss of hearing.

**\*5** The defendants rely on the length of LaBounty's sentence of confinement for their argument that his punishment was not atypical and significant. While it has been found in at least one other case that as much as 101 days in SHU did not run afoul of *Sandin, Sims,* 230 F.3d at 23, there is no litmus test based on the length of confinement alone-as the remand here demonstrates. *See also Colon,* 215 F.3d at 232 n. 5. Even a relatively brief term in segregated confinement may violate the law. *Taylor v. Rodriguez,* 238 F.3d 188, 196 (2d Cir.2001).

The defendants have also submitted evidence regarding the percentage of inmates in disciplinary confinement. These statistics do not address the specific conditions experienced by LaBounty during his confinement in SHU. *See Welch v. Bartlett,* 196 F.3d 389, 393-94 (2d Cir.1999) (vacating summary judgment where plaintiff alleged that SHU hygiene conditions were far inferior to those in general population). "[M]erely calculating the percentage of prisoners sentenced to SHU confinement" says nothing about the qualitative experience of prisoners in confinement and the relative degree to which they are deprived of the care and facilities at issue here. *Kalwasinski v. Morse,* 201 F.3d 103, 107 (2d Cir.1999).

The defendants make several additional arguments which can swiftly be rejected. They argue that only those deprivations experienced by LaBounty that independently constitute a constitutional violation-such as deliberate indifference to his serious medical needs in violation of the Eighth Amendment or an interference with his ability to pursue litigation in violation of the First Amendment-should be considered in judging whether LaBounty suffered atypical and significant hardships. There is no authority within either *Sandin* or its progeny in this Circuit for such a heightened showing. The defendants also argue that the issue of whether LaBounty suffered atypical and significant hardships should be tested not by his personal experience in SHU but by what prison regulations prescribe as the standard for treatment of SHU prisoners. They contend, for instance, that what is

relevant is that SHU prisoners are supposed to receive one hour per day of out of cell exercise and either two or three showers a week (depending on the level of prison) and not that LaBounty contends he received no opportunity to exercise and two brief showers in one month. The individualized inquiry required by the law is of the actual experience of the inmate, not what the experience should have been. *Sims,* 230 F.3d at 22-23. Finally, the defendants contend that they are entitled to summary judgment because while LaBounty's description of his deprivations is sufficient to create issues of fact regarding his own experience, he has not presented evidence that inmates in general population or in administrative confinement were not subjected routinely to those same deprivations. LaBounty has, until this point in the litigation, proceeded *pro se.* He was entitled to rely on the prison's regulations, well established law, and the basic standards of decency, to make the point that the deprivations of medical care, exercise, showers, books, and writing material that he alleges he experienced for one month cannot be the general experience of inmates incarcerated in New York state.

*Liberty Interest Created by State Law*

**\*6** The defendants argue that New York State has not granted inmates a protected liberty interest in remaining free from disciplinary confinement. In *Hewitt v. Helms,* 459 U.S. 460, 471-72 (1983), the Supreme Court held that a state-created "liberty interest arises when state statutes or regulations require, in 'language of an unmistakably mandatory character,' that a prisoner not suffer a particular deprivation absent specified predicates." *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999). *Sandin* did not replace *Hewitt*'s description of the process that creates a cognizable "liberty interest." *Tellier,*-F.3d-, 2001 WL 457767, at \*7; *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999); *Welch,* 196 F.3d at 394 n. 4. Where a regulation requires "in language of an unmistakably mandatory character, that a prisoner not suffer a particular deprivation absent specified predicates," *Tellier,*-F.3d-, 2001 WL 457767, at \*8 (citation omitted), then the regulation creates a protectable liberty interest.

New York regulates the process through which SHU disciplinary confinement may be imposed. Regulations allow such confinement only upon "[d]isposition of superintendent's Tier III hearing for a designated period of time as specified by the hearing officer." N.Y. Comp.Codes R. & Regs. tit. 7, § 301.2 (McKinney 1999).

The regulations further explain the manner in which the Tier III hearings must be conducted.

> Upon receipt of a misbehavior report from the review officer, the hearing officer *shall* commence the superintendent's hearing as follows:
>
> (a) The misbehavior report *shall* be served on the inmate at least 24 hours before the superintendent's hearing. If the inmate is confined and requests an assistant, the hearing *may not* start until 24 hours after the assistant's initial meeting with the inmate.
>
> (b) The inmate *shall* be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals. The entire hearing *must* be electronically recorded.
>
> (c) The inmate when present may reply orally to the charge and/or evidence and *shall* be allowed to submit relevant documentary evidence or written statements on his behalf.

N.Y. Comp.Codes R. & Regs. tit. 7, § 254.6 (McKinney 2000) (emphasis supplied). The regulations provide that "where the hearing officer affirms the charges on the basis of the evidence, the hearing officer may impose ... confinement to a cell or room continuously or to a special housing unit continuously or on certain days during certain hours for a specified period." *Id.* § 254.7.

It has long been recognized that New York's regulations authorizing restrictive confinement in SHU "provide sufficient limitation on the discretion of prison officials to create a liberty interest." *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984). *See also Sealey,* 197 F.3d at 585 (construing New York regulation regarding administrative confinement in SHU). New York has therefore created a liberty interest protected by the Due Process Clause.

### B. *Qualified Immunity*

 **\*7** The defendants contend that they are entitled to qualified immunity. Qualified immunity protects a state actor sued in his individual capacity from a suit for damages. *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001). A state actor is qualifiedly immune if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable

for the defendant to believe that his action did not violate such law." *Id.* (citation omitted).

LaBounty claims that he was deprived of his procedural due process rights during the 1995 disciplinary hearing because he was denied, among other things, the right to call witnesses and to introduce documentary evidence.[7] The law was clearly established in January 1995 that inmates have the right to call witnesses and submit documentary evidence at disciplinary hearings.[8] *Wolff v. McDonnell,* 418 U.S. 539, 566 (1974); *Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994). Since the contours of LaBounty's due process rights were well defined by both Supreme Court and Second Circuit precedent by the time Vuturo conducted LaBounty's disciplinary hearing in January 1995, the defendants have not demonstrated that they are entitled to qualified immunity as a matter of summary judgment.

### C. *Personal Involvement*

Defendants contend that they are not liable for the alleged due process violations because none of the remaining defendants was personally involved in the January 1995 disciplinary hearing. The defendants argue that hearing officer Vuturo is the only proper defendant and that no action may proceed against him because he was never served in this case. As LaBounty will be appointed counsel in this case, counsel for all parties will be able to explore this issue further.[9]

### D. *Appointment of Counsel*

Plaintiff has submitted an application requesting counsel. In determining whether to grant a request for counsel, the Court must consider

> the merits of plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel.

*Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 172 (2d Cir.1989). As a threshold matter, plaintiff must demonstrate that his claim has substance or a likelihood of success in order for the Court to grant plaintiff's request for counsel. *See Hodge v. Police Officers,* 802

*F.2d 58, 61 (2d Cir.1986)*. Based on the Court's familiarity with this case and the legal issues presented, LaBounty's claim has substance and LaBounty has shown a need for representation. Accordingly, plaintiff's request for counsel is granted.

CONCLUSION

For the reasons stated, defendants' motion for summary judgment is denied. Plaintiff's request for counsel is granted. The Pro Se Office of this Court shall seek Pro Bono counsel for this plaintiff.

**\*8** SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 1658245

Footnotes

1    The claims brought by the plaintiff that survived summary judgment were tried before a jury on October 4, 1998. On October 6, 1998, the jury returned a verdict for LaBounty on his claim that Nurse Millie Rivera had been deliberately indifferent to his serious medical needs and awarded him $1 in nominal damages. The Second Circuit denied the appeals from the trial and the summary judgment opinion, but reversed the dismissal of the due process claim at issue here. *LaBounty v. Kinkhabwala,* No. 99-0329, 2001 WL 99819 (2d Cir. Feb. 5, 2001).

2    To the extent that the plaintiff reiterates in his opposition claims that have been previously dismissed or makes new claims unrelated to the issues which have been remanded, those claims are not properly before this Court and the Court does not consider them here.

3    Tier III hearings are held for " 'the most serious violations of institutional rules." ' *Colon v. Howard,* 215 F.3d 227, 230 n. 1 (2d Cir.2000) (citation omitted).

4    Plaintiff asserts that his spinal condition was, at all relevant times, well-documented and diagnosed.

5    A porter is an inmate who is also serving a sentence in SHU.

6    Although not included in the list of issues from the February 13, 2001 Order, LaBounty also presents evidence that he was allowed only two showers in one month.

7    The parties agreed in February 2001 that the procedural irregularities at issue here were the delay in the hearing, the examination of witnesses outside of LaBounty's presence, and a prejudgment of the merits by a hearing officer. The defendants do not object to LaBounty's emphasis in this motion on the interference with his right to offer evidence.

8    The defendants characterize the pertinent inquiry as whether the law was clearly established in January 1995, that inmates have a liberty interest in remaining free from SHU confinement. Defendants argue that the Second Circuit law since *Sandin* has been "ambiguous at best." The extent to which *Sandin* may have unsettled the law on this issue is irrelevant since *Sandin* was handed down after LaBounty's hearing. The law was "clearly established" as of January 1995, that inmates have a liberty interest in remaining free from segregated confinement such as SHU. *See, e.g., Walker v. Bates,* 23 F.3d 652, 655-56 (2d Cir.1994); *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984).

9    The defendants argue that LaBounty failed to exhaust his administrative remedies by not filing grievances regarding the conditions in SHU. Because the defendants raised this argument for the first time in their reply brief and it has not been developed, it will not be considered. *See Strom v. Goldman, Sachs & Co.,* 202 F.3d 138, 142 (2d Cir.1999) (holding that it would not consider arguments raised in a reply brief because "[w]e repeatedly have said that we will not consider contentions first advanced at such a late stage").

2009 WL 3055270
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Reuben McDOWELL, Plaintiff,
v.
Michael GATES; Lt. Vanwinkle; C.
Hall; and M. Harpp, Defendants.

Civil Action No. 9:06–cv–1060 (GLS/DRH).
|
Sept. 21, 2009.

**Attorneys and Law Firms**

Reuben McDowell, Queensbury, NY, pro se.

Murphy, Burns, Barber & Murphy, LLP, Thomas
K. Murphy, Esq., of Counsel, Albany, NY, for the
Defendants.

### ORDER

GARY L. SHARPE, District Judge.

 **\*1**  The above-captioned matter comes to this court
following a Report–Recommendation by Magistrate
Judge David R. Homer, duly filed August 27, 2009.
Following ten days from the service thereof, the Clerk has
sent the file, including any and all objections filed by the
parties herein.

No objections having been filed, and the court
having reviewed the Magistrate Judge's Report–
Recommendation for clear error, it is hereby

ORDERED, that the Report–Recommendation of
Magistrate Judge David R. Homer filed August 27, 2009
is ACCEPTED in its entirety for the reasons state therein,
and it is further

ORDERED, that the defendants' motion for summary
judgment (Docket No. 64) is GRANTED as
to McDowell's claims for insufficient notice, false
misbehavior report, and the Equal Protection Clause
claim for failing to charge Martin with a disciplinary

violation and DENIED in all other respects, and it is
further

ORDERED, that the Clerk of the court serve a copy of
this order upon the parties in accordance with this court's
local rules.

IT IS SO ORDERED.

### REPORT–RECOMMENDATION AND ORDER [1]

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Reuben McDowell ("McDowell"), an
inmate presently in the custody of the New York
State Department of Correctional Services and formerly
incarcerated at the Warren County Correctional Facility
("WCCF"), brings this action pursuant to 42 U.S.C.
§ 1983 alleging that the four defendants, all Warren
County employees, [2] violated his constitutional rights
under the Fourteenth Amendment Due process Clause.
Second Am. Compl. (Docket No. 45). Presently pending
is defendants' motion for summary judgment or to dismiss
the second amended complaint pursuant to Fed.R.Civ.P.
12(b)(6) and 56. Docket No. 64. McDowell opposes the
motion. Docket No. 65. For the following reasons, it is
recommended that defendants' motion be granted in part
and denied in part.

### I. Background

The facts are related herein in the light most favorable to
McDowell as the nonmoving party. *See* subsection II(A)
*infra.*

#### A. The Altercation

On June 15, 2006, while incarcerated at the WCCF,
McDowell was involved in an altercation with another
inmate, Scott Martin. Gates Aff. (Docket No. 64–4)
¶ 3; *see also* Docket No. 64–5 (criminal investigation
of altercation); Docket No. 65–2 at 21–23 (same). A
criminal investigation followed. Docket Nos. 64–5, 65–
2 at 21–23. During the investigation, New York State
Police investigator Douglas David interviewed defendants
Harpp and Gates, Corrections Officers Lemelin and

Burch, Sgt. Vaisey, and inmates Bowling and Martin. Docket Nos. 64–5 at 3–5. 65–2 at 21–23. The investigation revealed as follows.

Harpp was letting inmates out of their cells to move around the cell block when he heard what he thought was a fight. Docket Nos. 64–5 at 3–6, 64–6 at 4, 65–2 at 21. Harpp saw McDowell atop Martin, who was pinned to the floor, punching Martin repeatedly. Docket Nos. 64–5 at 3, 64–6 at 4, 65–2 at 21. The altercation resulted from a disagreement over a chair in front of the television. Docket Nos. 64–5 at 4–7, 65–2 at 22. Another inmate, Bowling, was seated in the chair when McDowell ordered him to move. Docket Nos. 64–5 at 4–7, 65–2 at 22–23. When Bowling arose, Martin sat in the chair and McDowell and Martin exchanged words. Docket Nos. 64–5 at 4–7,; 65–2 at 23. McDowell then struck Martin in the back of the head, using both hands, one with a pen and the other with a fork, to slash at Martin, eventually knocking him from the chair. Docket Nos. 64–5 at 4–7, 65–2 at 22–23. Martin released McDowell when Harpp directed the two to cease fighting, but Martin continued to punch. Docket No. 64–5 at 4, 7.

**\*2** Another inmate, Salmans, submitted an affidavit in support of McDowell alleging that the genesis of the altercation was racial animus. Salmans Aff. (Docket No. 65–2 at 11–12) at 1. Salmans overheard Bowling and some other gentlemen plotting to "inflict bodily harm upon ... McDowell because, one he was African American, and two because they didn't like the fact that he watched discovery channel ....“ *Id.* Salmans also affirms that Bowling had "sharpened spoon handles in [his] socks prior to the incident happening." *Id.* Salmans asserts that on June 15, 2006, Martin and Bowling approached McDowell in a hostile manner and that they were the aggressors. *Id.* at 2. Additionally, Salmans states that no one sought eye witness testimony from any inmates in the cell block. *Id.*

Harpp called for assistance, separated the two inmates, and ordered everyone else back to their cells. Docket Nos. 64–5 at 3–6, 64–6 at 4. McDowell was ordered back to his cell, but sought to continue fighting with Martin, ceasing only when other corrections officers appeared. Docket Nos. 64–5 at 3–6, 64–6 at 4. Officers Lemelin and Burch responded to the call. Docket No. 64–5 at 3, 4. Lemelin arrived as the inmates were returning to their cells and noticed that McDowell had blood on the back of his

clothes. *Id.* at 3. Lemelin then checked on Martin and observed blood on his face. *Id.* Martin was found to be bleeding from his nose, neck, and back of the head. *Id.* at 4, 7. Lemelin escorted Martin to the infirmary. *Id.* at 3, 7. While in the infirmary, Lemelin heard Martin tell medical staff that he was stabbed with something during the altercation. *Id.* at 3. Shortly thereafter, Martin was transported to the hospital where he received a staple in the back of his head to close a laceration. *Id.* at 4, 7.

With two other officers, Lemlin went to McDowell's cell to search for the weapon. Docket No 64–5 at 3. A tan, hard, plastic fork with blood on it was found hidden in a tote bag. *Id.* at 4. Lemelin observed blood on a plastic chair by the television and on the nearby carpet. *Id.* at 3. Lemelin found a black Bic pen on one of the chairs, though it appeared to have sustained no damage and had no noticeable blood on it. *Id.* at 3.

## B. The Disciplinary Proceedings

McDowell was issued a misbehavior report charging him with assault, failure to obey an order to stop fighting, failure to obey an order to return to his cell, and offenses against the public order. Docket Nos. 45 at 21, 64–6 at 2. McDowell was confined to administrative segregation pending a disciplinary hearing. Docket No. 64–6 at 3. On June 16, 2006, David met with Gates, a Captain in the Warren County Sheriff's Department with responsibility for overseeing the operations of the WCCF, to review the video of the fight. Docket No. 64–5 at 4. The video confirmed the witness testimony, showing McDowell holding objects and making chopping motions toward Martin as if he is attempting to stab him. *Id.* Gates directed that McDowell be charged with second degree assault, which David did on June 19, 2006. *Id.* at 5, 8–9.

**\*3** On June 26, 2006, McDowell was summoned by Hall for an informal meeting. McDowell Aff. (Docket No. 65–3) ¶¶ 11–12. During the meeting, Hall disclosed the contents of Harpp's memorandum and the video of the incident. *Id.* ¶ 12. Hall offered McDowell a plea bargain on the disciplinary charges of 240 days of keeplock [3] which McDowell refused and requested a formal hearing. *Id.* McDowell was allowed to view neither the report nor the video. *Id.;* Docket No. 65–2 at 27–28. On June 30, 2006, McDowell was notified that his formal disciplinary hearing would commence on July 1, 2006. Docket Nos.

45 at 55, 64–6 at 5, 8. The hearing was convened on July 1 with Hall as the hearing officer and then adjourned. Docket Nos. 45 at 56, 64–6 at 7–8.[4] The hearing was reconvened on July 7, 2006. Docket Nos. 45 at 24, 64–6 at 7–8. On July 7, 2006, McDowell was found guilty of all four charges based on the facility's video of the fight and Harpp's written statement. Docket Nos. 45 at 24, 64–6 at 6–8. McDowell was sentenced to 240 days of keeplock. Docket Nos. 45 at 24, 64–6 at 8.

### C. The Appeal

On July 11, 2006, McDowell appealed the disciplinary hearing findings. Docket Nos. 45 at 45–52, 64–6 at 11–18, 65–2 at 45–55. McDowell claimed that the misbehavior report failed to (1) include McDowell's side of the story,[5] (2) contain any grounds for the two charges that McDowell failed to follow an order, and (3) make sense in the fourth charge. Docket Nos. 45 at 45–47, 64–4 at 12–13,. McDowell also contended that Harpp's statement was insufficient to support the charge of assault, McDowell was improperly held in administrative segregation without being informed of the particulars of his status in contravention of the facility's policies,[6] he was denied necessary assistance for his disciplinary hearing,[7] and Hall was a biased hearing officer. Docket Nos. 45 at 47–52, 64–6 at 13–18. On July 15, 2006, McDowell amended his appeal alleging that the meeting on June 26, 2006 served as his first formal hearing for which he was provided no notice and the subsequent hearing and resulting disposition of July 1 and 7 were untimely. Docket Nos. 64–6 at 19–20, 65–2 at 53–54. McDowell further contended that the proceedings should have been recorded, the disposition should have included a more precise statement of the evidence relied upon in rendering the decision, and the end and start dates of his punishment were overly vague. Docket Nos. 64–6 at 20–21, 65–2 at 54–55. On July 13, 2006, defendant VanWinkle affirmed the disciplinary conviction and sentence. Docket Nos. 45 at 53–54, 64–6 at 9–10, 65–2 at 39–40.

### D. The Grievances

On July 24, 2006, McDowell filed two grievances regarding the "failure of the Administration to provide [McDowell] with a copy of the admin[istrative] seg

[regation] order and [the] reason for such segregation within 24 hours of confinement as required by ... [law] ..." and the fact that both the formal and informal hearings were functional equivalents and both deemed formal proceedings. Docket Nos. 64–7 at 5–6, 65–2 at 35–36. McDowell sought dismissal of the misbehavior report. Docket Nos. 45 at 26, 64–7 at 8, 65–2 at 35.

**\*4** On July 27, 2006, Gates sent a memorandum to McDowell setting forth his determinations. Docket Nos. 45 at 26, 64–7 at 8–10, 65–2 at 37. Gates found that McDowell should have received a copy of the administrative segregation order and that the regulations, policies, and administrative segregation order sheets would be modified to allow inmates automatically to receive a duplicate of those orders when issued. Docket Nos. 64–7 at 8, 65–2 at 37. Gates rejected McDowell's arguments that both hearings were functional equivalents as informal hearings were a common method for attempting to resolve disciplinary actions without the need for a formal proceeding. Docket Nos. 64–7 at 8, 65–2 at 37. Finally, Gates found that "there is no evidence that the formal disciplinary hearing process was violated [by McDowell's failure to receive a copy of the administrative segregation order]." Docket Nos. 64–7 at 8, 65–2 at 37.

During July 2006, McDowell filed five grievances with the New York State Commission on Corrections. Docket No. 45 at 28–35. The grievances alleged that (1) the disciplinary hearing practices were inadequate and the opportunity to appeal did not exist, *id.* at 28;, (2) WCCF employees were not following their own procedures and protocols in preparing misbehavior reports, *id.* at 29–30;[8] (3) charges were being applied in a racially discriminatory manner[9] and due process protections were not being observed, *id.* at 31–32; (4) McDowell received no assistance in preparing for his disciplinary hearing despite his request, *id.* at 33; and (5) his misbehavior report should have been dismissed, *id.* at 34–35. On September 14, 2006, McDowell's appeal of Gates' determinations was denied by the Commission. *Id.* at 27, 44.

McDowell was indicted on criminal charges by a grand jury for assault and criminal possession of a weapon. Docket No. 64–5 at 10. On December 22, 2006, McDowell entered a plea of guilty to criminal possession of a weapon. *Id.* at 10. On January 31, 2007, McDowell was sentenced as a second felony offender principally to imprisonment

for two to four years. *Id.* at 10. McDowell waived any right to appeal. *Id.* at 10.

## II. Discussion

In his second amended complaint, McDowell alleges that defendants violated his due process rights by failing to (1) provide him with proper notice, assistance, and a fair and impartial hearing; (2) follow WCCF' own rules and procedures; and (3) dismiss his disciplinary charges after his grievance was accepted by Gates. Defendants contend that McDowell has failed to state a claim and that they are protected by qualified immunity.

### A. Legal Standard

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, a complaint containing conclusory allegations without factual support fails to meet even the liberal standard of Rule 12(b)(6). *De Jesus v. Sears, Roebuck & Co.* 87 F.3d 65, 70 (2d Cir.1996). Thus, dismissal is only warranted if it appears, beyond a reasonable doubt, that the non-moving party cannot prove a set of facts which would support his or her claim or entitle him or her to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Harris v. City of N.Y.,* 186 F.3d 243, 247 (2d Cir.1999).

**\*5** Defendants have submitted various documents outside the pleadings in support of their motion. Those documents have been considered by the Court. Thus, defendants' motion must be considered as one for summary judgment. *Cleveland v. Caplaw Enter.,* 448 F.3d 518, 521 (2d Cir.2006). A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as

determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### B. Fourteenth Amendment

#### 1. Due Process

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined by confinement separate

from the general prison population alone is insufficient to establish an atypical and significant deprivation. The Second Circuit has articulated a two-part test whereby the length of time a prisoner was held in separate confinement as well as "the conditions of the prisoner's confinement ... relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)). Where the period of confinement exceeds thirty days, "refined fact-finding" is required to resolve defendants' claims under *Sandin. Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000); *see also Davis v. Barrett,* 576 F.3d 129, 2009 WL 2411811, at *3–5 (2d Cir. Aug. 7, 2009) (finding questions of fact and insufficient record to grant defendants' summary judgment under *Sandin* where plaintiff spent sixty days in separate confinement). Thus, given the 240 days of McDowell's confinement here, questions of fact exist as to the liberty interest asserted by McDowell.

### a. Disciplinary Report [10]

**\*6** McDowell contends that his disciplinary report was defective. McDowell possessed no constitutional right to be free "from falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," but he is still entitled "not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Thus, a fair hearing would cure any due process violations resulting from false accusations. *Grillo v. Coughlin,* 31 F.3d 53, 56 (2d Cir.1994); *Livingston v. Kelly,* 561 F.Supp.2d 329, 331 (W.D.N.Y.2008) ("As the Second Circuit noted in its decision in this case, an inmate's allegation that he has been found guilty of false disciplinary charges may support a constitutional claim if he also alleges that he was denied the minimal procedural due process protections ...."). However, for the reasons discussed *infra,* questions of fact exist as to the sufficiency of the procedures afforded McDowell and, accordingly, defendants' motion on this ground should be denied.

### b. Fair and Impartial Hearing

While inmates are not given "the full panoply of [due process] rights," they are still afforded certain procedural rights. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974).

Prisoners are "entitled to advance written notice ...; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted).

### i. Notice [11]

Due process requires written notice twenty-four hours prior to the commencement of a formal disciplinary hearing in order "to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are ...." *Wolff,* 418 U.S. at 564 (citations omitted). "The effect of the notice should be to compel the charging officer to be sufficiently specific as to the misconduct ... charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges...." *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001) (citations omitted). Such notice guarantees a meaningful hearing where a prisoner can properly defend himself against the pending charges. *Id.* at 193.

In this case, McDowell's formal hearing notice stated that it was in reference to acts occurring on June 15, 2006, provided the date and time of the disciplinary hearing, and outlined instructions that "[o]n the day of the hearing [McDowell] will need to provide [Hall] with a list of witnesses and questions to be asked of them by [Hall] ." Docket Nos. 45 at 55, 64–6 at 5, 8. McDowell had already been provided with a copy of the misbehavior report specifying the charges. Docket Nos. 45 at 53, 64–6 at 2–9, 65–2 at 39. This written notice sufficed because it provides the material information pertaining to the disciplinary charges at hand. *See Sira,* 380 F .3d at 70–71 (explaining that proper notice should indicate the "inmates toward whom ... [the] misconduct was directed," as well as "describ[ing] words, actions, [and] means employed by [the inmate] to further [the misconduct]."). Therefore, even construing the facts in the light most favorable to McDowell, no reasonable factfinder could conclude that McDowell was not given sufficiently specific information concerning the charges or provided with the information needed to defend himself.

**\*7** Accordingly, defendants' motion on this ground should be granted.

### ii. Opportunity to Present Defense

McDowell claims that he was denied (1) access to the memorandum and video tape on which Hall based his disposition and (2) assistance in presenting his defense.

"Courts have long recognized ... that the right to know evidence supporting prison disciplinary rulings is not absolute. *Sira,* 380 F.3d at 74 (citations omitted). Because correctional facilities present "risks of violence or intimidation directed at other inmates or staff ... [a hearing officer may decline] disclosure of evidence [in light of] such risks ...." *Id.* at 75 (internal quotation marks and citation omitted). Generally, the judgment of a prison officer in this context will not be questioned as long as there was "freedom from arbitrary governmental action." *Id.* (citations omitted). Accordingly, when such procedural rights are denied, "prison officials ... must offer a reasonable justification for their actions ...." *Id.* (citations omitted).

In this case, it is undisputed that McDowell was not permitted to see either the memorandum or the video. McDowell Aff. ¶ 12; Docket No. 65–2 at 27–28. Additionally, do defendants offer no evidence or an explanation how showing either piece of evidence to McDowell could lead to violence or intimidation. McDowell was told the substance of both pieces of evidence at the June 26 meeting and again during the formal hearing. McDowell Aff. ¶ 12. Thus, McDowell was fully aware of the content of the two pieces of evidence. Because of these conversations, defendants contend that it was unnecessary that McDowell actually view the video or memorandum. However, due process requires such disclosure unless defendants offer a reasonable justification for withholding disclosure, such as concerns for safety and security. As no such explanation was provided, there is a question of fact as to the reasonableness of withholding the evidence from McDowell. Accordingly, defendants' motion should be denied on this ground.

Additionally, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir.1988). Such assistance is intended to aid inmates to "gather [ ] evidence, obtain[ ] documents and relevant tapes, and interview [ ] witnesses. At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself." *Id.* at 898. The Second Circuit has also held "that for inmates disabled by confinement in [separate housing] ..., the right to substantive assistance is an obligation ... [to] be provided in good faith and the best interests of the inmate." *Id .* Any violations of this right to assistance are reviewed to assess "whether the error was harmless or prejudicial." *Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991).

**\*8** In this case, McDowell was never offered assistance in defending the disciplinary charges although McDowell was confined in separate housing and unable to investigate and seek witnesses. Defendants rely on the fact that McDowell failed to call any witness at the hearing so that any error here was harmless and not prejudicial. However, McDowell asserts that he submitted a witness list to a corrections sergeant who allegedly delivered it to Hall. Docket No. 45 at 33. Viewing the evidence in the light most favorable to McDowell, this presents a material question of fact. Moreover, Salmans' affidavit belies this claim. Salmans Aff. at 1–2. Salmans states that no inmate eyewitnesses were questioned and, if he had been contacted earlier, Salmans could have provided evidence exculpating McDowell. Therefore, viewing the evidence in the light most favorable to McDowell, the denial of assistance was prejudicial.

Accordingly, defendants' motion on this ground should be denied.

### iii. Hearing Officer

Prisoners enjoy a constitutional right to have a fair and impartial hearing officer preside over their disciplinary hearings. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citations omitted). Here, as discussed *supra,* McDowell asserts that he submitted a list of witnesses to be called at his disciplinary hearing which was delivered to Hall and

ignored. Docket No. 45 at 33. While hearing officers not held to the same standards as judges, the act of preventing McDowell from presenting witnesses to rebut the charges and offer a defense raises a question of fact as to Hall's impartiality to the extent that it prejudiced McDowell. Thus, defendants' motion on this ground should be denied.

### iv. Disposition [12]

"Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence which supports the decision of the prison disciplinary board." *Freeman v. Rideout,* 808 F.2d 949, 954–55 (2d Cir.1986) (citations omitted). However, this presupposes that an inmate received procedural due process. As discussed *supra,* questions of fact have been raised whether McDowell was denied adequate assistance and an impartial hearing officer. Thus, viewing the evidence in the light most favorable to McDowell, his due process rights were not upheld and a question of fact exists as to the disposition. Accordingly, defendants' motion should be denied on this ground.

### c. Administrative Segregation

A prisoner has a "liberty interest in remaining free from administrative confinement unless a correction officer has reasonable grounds to believe that he poses a threat to the order, safety or security of the correctional facility." *Lowrance v. Achtyl,* 20 F.3d 529, 237 (2d Cir.1994). In this case, regardless of which inmate was the aggressor, McDowell was involved in a fight where Martin suffered serious injuries and required medical attention at a hospital emergency room. Even viewing the facts in the light most favorable to McDowell, this event provided reasonable cause to believe that McDowell posed a threat to the safety and security of the correctional facility justifying his separation from the general prison population.

**\*9** "A prisoner subject to administrative confinement, pending the resolution of misconduct charges, is entitled to at least some notice of the charges against him and an opportunity to present his views ...." *Soto v. Walker,* 44 F.3d 169, 172 (2d Cir.1995) (internal

quotation marks and citations omitted). [13] "Officials must conduct an informal, nonadversary evidentiary review of the information in support of the ... administrative confinement, and that proceeding must occur within a reasonable time .... " *Id.* (internal quotation marks and citations omitted). Failure to provide such an informal hearing within seven days has been determined a due process violation. *Id.* at 172–73 (citations omitted); *see also Hameed v. Coughlin,* 37 F.Supp.2d 133, 149 (N.D.N.Y.1999) ("The regulations provide only that an inmate assigned to administrative segregation will have his status reviewed every seven days for the first two months, and every thirty days thereafter.") (*citing* N.Y. Comp.Codes R. & Regs. tit. 7, § 301 .4(d)).

In this case, only one of the requirements was met. McDowell was apprised of the charges against him when he was provided with a copy of the misbehavior report. Docket No. 45 at 53, 64–6 at 9, 65–2 at 39. Moreover, McDowell was summoned for an informal meeting where he was given more specific bases for his confinement— the contents of Harpp's memorandum and a description of what was on the video tape. McDowell requested a formal hearing, insinuating that he wished to forego immediate presentation of a defense. McDowell Aff. ¶¶ 11–12. However, this informal hearing occurred eleven days after he was placed in administrative segregation. *Id.*

McDowell was also permitted to file a grievance on July 1 concerning why he was still confined in segregation. Docket No. 45 at 23. He received a response, explaining that he "jeopardized the safety, security and good order of the facility by engaging in an altercation that left an inmate with a staple in his head." Docket No. 45 at 22. Writing such a grievance has been deemed adequate to satisfy the constitutional requirement of an adequate opportunity to be heard and give officials time to review the reasons for segregation. *Lowrance,* 20 F.3d at 536. However, this occurred sixteen days after McDowell was placed in segregation. As such, it too was not timely and does not suffice to satisfy the requirements of due process violation. *Soto,* 44 F.3d at 172–73.

Accordingly, defendants' motion should be denied on this ground.

### 2. False Misbehavior Reports [14]

Liberally construing McDowell's complaint, he alleges that defendants issued false misbehavior reports in violation of his constitutional rights. As discussed *supra*, an inmate enjoys a right not to be deprived of a liberty interest without due process. However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman, 808 F.2d at 951.* "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862. McDowell has offered no evidence that any misbehavior report was issued in retaliation for McDowell engaging in constitutionally protected activities. Accordingly, McDowell's claim of a violation of his right to due process based on allegedly false reports cannot stand and defendants' motion as to that claim should be granted.

### 3. Equal Protection

**\*10** The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).* In order to establish an equal protection violation for racially discriminatory conduct, the plaintiff must "prove purposeful discrimination" based on race. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995).

In this case, McDowell asserts that, first, Harpp failed to file a misbehavior report against Martin because Martin was white. McDowell makes at best only vague and conclusory allegations that race was a motivating factor in the different treatment. The mere fact that two individuals of different races were treated differently, without more, fails to establish a prima facie case for an equal protection deprivation. *See De Jesus v. Sears Roebuck & Co., Inc., 87 F.3d 65, 70 (2d Cir.1996).* Defendants' motion on this claim should be granted.

Second, McDowell contends that Caucasian inmates were provided with copies of their administrative segregation orders while in administrative segregation while McDowell was advised that copies of the orders were not permitted to be disbursed to the inmates. McDowell has submitted a copy of an administrative segregation order given to a white inmate during that

inmate's confinement in segregation. *See* Docket No. 45 at 36 (copy of administrative segregation order given to a white inmate, dated July 4 and 5 indicating that the inmate would remain in administrative segregation for "causing a disturbance" and would be reviewed in five days), 26 (granting grievance and pledging to McDowell that the facility policies would be changed to permit inmates to receive a copy of segregation orders, dated July 27, 2006).

Thus, viewing this evidence in the light most favorable to McDowell, evidence has been proffered that in the period when McDowell was confined in administrative segregation, white inmates received copies of the segregation orders while black inmates did not. This suffices to raise a question of fact as to whether McDowell was denied copies of his order intentionally because of his race. Accordingly, defendants' motion on this claim should be denied.

### C. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed .Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the ... official to believe that his [or her] acts did not violate those rights." *Smith v. City of Albany,* No. 03–CV–1157, 2006 WL 839525 \*16 (N.D.N.Y. Mar. 27, 2006) (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

**\*11** A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. As discussed *supra,* it is

undeniable that by 2006, legal precedent established that an inmate was entitled to due process of law before being confined in administrative segregation, including a fair and impartial hearing, and that corrections officers could not discriminate against inmates based upon race. Accepting all of McFadden's evidence as true, it is also clear that defendants were acting unreasonably in denying McDowell a fair and impartial hearing, keeping him in segregation without affording a timely and informal opportunity to be heard, and failing to provide orders that were available to similarly situated white inmates confined to segregation.

Accordingly, it is recommended that defendants' motion on this ground be denied.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Docket No. 64) be:

1. **GRANTED** as to McDowell's claims for insufficient notice, false misbehavior report, and the Equal Protection Clause claim for failing to charge Martin with a disciplinary violation; and

2. **DENIED** in all other respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2009 WL 3055270

### Footnotes

1   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2   Two New York State defendants were previously dismissed from the action. *See* Docket Nos. 11, 57.

3   Keeplock segregates an inmate from other inmates in the general population of a prison and denies the inmate normal prison activities. *Cf. Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6.

4   On July 1, McDowell filed a grievance concerning the length of time he had spent in administrative segregation without a notice or information concerning the basis. Docket No. 45 at 23. The grievance form was returned to McDowell the same day with an explanation from Hall that McDowell was "moved out of population because he jeopardized the safety, security, and good order of the facility by engaging in an altercation that left an inmate with a staple in his head." Docket No. 45 at 22.

5   Misbehavior reports issued for an incident involving more than one inmate should include a separately stated section regarding "the facts and circumstances surrounding each inmate's involvement ...." Docket No. 65–2 at 31–32.

6   State law required that "[a]n inmate who threatens the safety, security, and good order of the facility may be immediately confined in a cell ... pending a disciplinary hearing ... in administrative segregation ...." Docket No. 65–2 at 33, 34. However, "[w]ithin 24 hours of such confinement, the inmate shall be provided with a written statement setting forth the reason(s) for such confinement." *Id.* Facility policy appears to specify the latter requirement, stating that inmates "shall be provided with a copy of the Administrative Segregation Order ...." *Id.* at 34.

7   State law provided that "[i]f an inmate is non-English speaking, illiterate, or for any other reason is unable to prepare a defense, assistance shall be provided to the inmate ...." Docket No. 65–2 at 31.

8   McDowell was angered by the fact that Harpp did not issue Martin a misbehavior report. Docket No. 45 at 30. According to Harpp, Martin complied with the orders, but McDowell asserts that actions after the incident are irrelevant if Martin's actions prior to the incident were not investigated. *Id.* at 30. McDowell was also provided with an inmate-oninmate incident report which he claims supports his position that the altercation was a mutual fight. Docket No. 65–2 at 17–20. However, McDowell threw punches and Martin was seriously injured requiring medical attention. *Id.* at 19–20.

**9**  McDowell asserts that defendants charged him with the unprecedented violation of "offenses to public order" because he is African American. Docket No. 45 at 31. McDowell also contends that two white inmates fought and one was hospitalized, but those inmates each received only thirty days of discipline. *Id.*

**10**  It appears that McDowell's claims surrounding the misbehavior report run afoul of the "favorable termination rule" of *Heck v. Humphrey,* 512 U.S. 477, 487–87 (1994). That rule provides that if a determination favorable to the plaintiff in a § 1983 action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must prove that the conviction or sentence has been reversed on direct appeal or declared invalid in order to recover damages under § 1983. This rule applies to challenges to procedures used in prison disciplinary proceedings. *Edwards. v. Balisok,* 520 U.S. 641 (1997). In this case, McDowell has both a criminal conviction and a disciplinary conviction. The criminal conviction was based on a guilty plea to criminal possession of a weapon in satisfaction of all charges. There is no evidence that McDowell's criminal conviction was vacated as he waived any right to appeal his criminal conviction. McDowell's contentions that his disciplinary conviction should be dismissed due to Harpp's failure to include McDowell's version of events may imply the invalidity of that conviction contrary to *Heck* and *Edwards.* However, defendants have not sought judgment on this ground and it will not, therefore, be considered.

**11**  To the extent that McDowell contends that his June 26, 2006 meeting constituted a formal hearing, those allegations are belied by McDowell's own rejection of the plea bargain and request for a formal disciplinary hearing. McDowell Aff. ¶¶ 11–12. Even construing the facts in the light most favorable to McDowell, it is beyond dispute that he was aware that his formal disciplinary hearing would follow the meeting, which it did and for which he was provided adequate and timely written notice.

**12**  To the extent that McDowell alleges that his federal rights were violated by Hall's refusal to record the disciplinary hearings, those claims are without merit. *See Dixon v. Goord,* 224 F.Supp.2d 739, 744 (S.D.N.Y.2002) (explaining that "the only written or audio record of [a] disciplinary hearing that must be maintained to comply with minimal due process standards is a written statement describing the evidence relied upon and the reasons for the determination.") (*citing Wolff,* 418 U.S. at 564–65). New York law requires that an electronic record of a disciplinary hearing be made, but such a record is not constitutionally required and "[violations of state law ... do not alone constitute a deprivation of due process ...." *Id.* at 744–45 (internal quotation marks and citations omitted).

**13**  It is important to note that the notice and opportunity to be heard required for an administrative segregation order is no where near as extensive or formal as that required during the course of a disciplinary hearing. *Soto,* 44 F.3d at 172 n. 3 (citations omitted). Thus, McDowell essentially has two prongs of his due process claim, the first regarding his disciplinary hearing and the process accorded him and the second relating to his confinement in administrative segregation.

**14**  To the extent that McDowell claims a constitutional violation because WCCF did not follow their own policy, such a claim is without merit. *See generally Russell v. Coughlin,* 910 F.2d 75, 78 (2d Cir.1990) ("The fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action does not settle what protection the federal due process clause requires.") (internal quotation marks and citations omitted); *Dixon,* 224 F.Supp.2d at 744–45.

---

**End of Document**  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Tinsley v. Greene, Not Reported in F.Supp. (1997)

1997 WL 160124

1997 WL 160124
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Larry TINSLEY, Plaintiff,

v.

Gary GREENE, Deputy Superintendent of Great
Meadow Correctional Facility; Jim Lanfear,
Maintenance Supervisor, Great Meadow
Correctional Facility; Gary Yule, Corrections
Officer, Great Meadow Correctional Facility;
and David Roberts, Senior Counselor, Great
Meadow Correctional Facility, Defendants.

No. 95–CV–1765 (RSP/DRH).
|
March 31, 1997.

**Attorneys and Law Firms**

Larry Tinsley, Pro Se.

Dennis C. Vacco, New York State Attorney General,
Darren O'Connor, Assistant Attorney General, of
counsel, for Defendants.

ORDER

POOLER, District Judge.

**\*1** The above matter comes to me following a report-
recommendation and order by Magistrate Judge David
R. Homer, duly filed on the 13th day of September,
1996. Dkt. No. 24. Following ten days from the service
thereof, the clerk has sent me the entire file, including any
objections thereto. Plaintiff Larry Tinsley filed objections.
Dkt. Nos. 25, 26.

In his report-recommendation, Magistrate Judge Homer
advises that Tinsley failed to establish or raise a genuine
issue of material fact regarding the nature of his
confinement. Report-recommendation, Dkt. No. 24, at
9–10. There is no dispute that prison officials confined
Tinsley to keeplock and loss of some privileges for 60
days after they conducted a search of his cell, found a
marijuana cigarette in the cell, and found Tinsley guilty
of possessing a controlled substance after a Tier III
disciplinary hearing. Tinsley's conviction and sentence

were affirmed on administrative appeal. In his lawsuit
under 42 U.S.C. § 1983, Tinsley raises several charges to
the manner in which defendants conducted the search and
disciplinary hearing. However, Tinsley failed to specify in
any manner that his punishment posed an "atypical and
significant hardship on [him] in relation to the ordinary
incidents of prison life." *Sandin v. Connor,* 515 U.S.
472, ——, 115 S.Ct. 2293, 1300, 132 L.Ed.2d 418, ——
(1995). Without this showing, plaintiff failed to allege a
deprivation of his Fourteenth Amendment due process
liberty interest, and his civil rights claim must fail. *Id.*

In his objections to the report-recommendation, Tinsley
makes general attacks regarding the alleged bias of
Magistrate Judge David Homer and argues that the
magistrate judge has misconstrued his claims. Plaintiff
also asks me to reconsider defendants' summary judgment
motion and review plaintiffs memorandum opposing the
motion. However, Tinsley has not raised any allegation
regarding the nature of his punishment, which is the
threshold issue under *Sandin.* I have reviewed the
entire file in this matter, including plaintiff's many
submissions, and I find that he failed to raised any
issue of fact to support an alleged deprivation of his
due process liberty interests. Magistrate Judge Homer's
thorough report-recommendation is neither biased nor a
mischaracterization of plaintiffs claims.

For the foregoing reasons, it is therefore

ORDERED that the report-recommendation of
September 13, 1996, is approved, and

ORDERED that plaintiffs' motion for default summary
judgment is denied as moot, and

ORDERED that defendants' motion for summary
judgment is granted, and it is further

ORDERED that the clerk serve a copy of this order upon
the parties by regular mail.

IT IS SO ORDERED.

HOMER, United States Magistrate Judge.

REPORT–RECOMMENDATION AND ORDER [1]

Tinsley v. Greene, Not Reported in F.Supp. (1997)

1997 WL 160124

The plaintiff a New York State Department of Correctional Services (DOCS) inmate currently confined at the Great Meadow Correctional Facility (Great Meadow), brought this pro se action pursuant to [42 U.S.C. § 1983](). Plaintiff alleges that defendants violated his rights under the Fourth and Fourteenth Amendments in connection with a search of his cell and ensuing disciplinary hearing. Plaintiff seeks compensatory and punitive damages as well as injunctive relief.

**\*2** Presently pending are defendants' motion for summary judgment (Docket No. 17), plaintiff's letter-memorandum requesting summary judgment by default (Docket No. 11), and plaintiff's motions for a pre-trial conference (Docket No. 20) and for appointment of counsel (Docket No. 21). For the reasons stated below, it is recommended that the defendants' motion be granted and that plaintiff's motions be denied.

## I. BACKGROUND

On October 30, 1995, while plaintiff was incarcerated at Great Meadow, defendant Greene received information from a confidential source that plaintiff was concealing escape materials. Defendant Greene ordered the search of plaintiff's prison cell. The search was executed by Corrections Officer Rando and defendant Yule and was supervised by Sergeant Smith. No escape materials were found. However, the officers found a rolled cigarette in plaintiff's cell. The cigarette tested positive for marijuana. Plaintiff was placed in keeplock [2] and was given a contraband receipt for the cigarette that was removed from his cell.

Plaintiff was served with a misbehavior report which charged him with possession of a controlled substance. A Tier III disciplinary hearing [3] was commenced on November 3, 1995 before defendant Lanfear as the hearing officer. During the hearing, plaintiff claimed that defendant Greene failed to corroborate the reliability of the confidential informant, the search was improperly supervised, he did not receive the requisite contraband slip, defendants did not remove any contraband item from plaintiff's cell, and defendants failed to sign the misbehavior report. Plaintiff also objected when witnesses were not called in the order he had requested.

At the conclusion of the hearing on November 7, 1995, defendant Lanfear found plaintiff guilty based upon the

> statement in the misbehavior report submitted by C.O. Rando endorsed by C.O. Yule. Testimony during hearing by C.O. Yule verified the report and stated the substance was found in Tinsley's cell. Testimony during hearing by Sgt. Sawyer stated he received the item found by C.O. Rando and tested same which proved positive for controlled substance. Testimony was considered during hearing by Tinsley.

Defs.' Statement Pursuant to Rule 7.1(f) (Docket No. 17), Ex. A, p. 16. Plaintiff was sentenced to confinement in keeplock for sixty days and loss of packages, commissary and telephone privileges for sixty days. Shortly after this action was commenced, plaintiff's conviction and sentence were affirmed on administrative appeal.

## II. SUMMARY JUDGMENT

### A. Legal Standard

Under [Fed.R.Civ.P. 56(c)](), if there is "no genuine issue as to any material fact ... the moving party is entitled to judgment as a matter of law ... where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *See [Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,]() 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).* The burden to demonstrate that no genuine issue of material fact exists falls solely on the moving party. *[Federal Deposit Ins. Corp. v. Giammettei,]() 34 F.3d 51, 54 (2d Cir.1994)*; *see also [Heyman v. Commerce and Industry Ins. Co.,]() 524 F.2d 1317, 1320 (2d Cir.1975).* Once the moving party has provided sufficient evidence to support a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" and cannot rest on "mere allegations or denials" of the facts asserted by the movant. [Fed.R.Civ.P. 56(e)](); *accord [Rexnord Holdings, Inc. v. Bidermann,]() 21 F.3d 522, 525–26 (2d Cir.1994).*

Tinsley v. Greene, Not Reported in F.Supp. (1997)

1997 WL 160124

**\*3** The trial court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmovant. *American Cas. Co. of Reading Pa. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994); *see also Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985). The nonmovant may defeat summary judgment by producing specific facts showing that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

B. Discussion

The defendants move for summary judgment on the grounds that (1) plaintiff's due process allegations fail to state a claim, (2) plaintiff's hearing was conducted in accordance with constitutional requirements, (3) the search of plaintiff's cell did not violate any of plaintiff's constitutional rights, and (4) defendants are entitled to qualified immunity.

1. Due Process Liberty Interest

Plaintiff contends that his due process rights were violated because the November 3–7, 1995 disciplinary hearing was improperly executed, and as a result, he was wrongly confined to sixty days keeplock.[4] In their motion for summary judgment, defendants contend that under *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), plaintiff lacked any liberty interest protected by the Due Process Clause.

A due process claim as alleged by plaintiff will lie under section 1983 only where the alleged violation infringed a cognizable liberty interest. *Allison v. Kyle,* 66 F.3d 71, 74 (5th Cir.1995). Under *Sandin,* a court must first determine whether the deprivation of which an inmate complains merits the protections afforded by the Due Process Clause. A protected liberty interest

> will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force. nonetheless imposes *atypical and significant*

> *hardship on the inmate in relation to the ordinary incidents of prison life.*

*Id.* at 2300 (emphasis added). The Court held that confinement of the plaintiff for thirty days in a segregated housing unit infringed no liberty interest protected by the Due Process Clause. *Id.* at 2302.

At first blush *Sandin* appeared to mark a radical change in the litigation of inmates' due process claims. It appeared to suggest that the number of sufficiently stated claims would be drastically reduced. *See Orellana v. Kyle,* 65 F.3d 29, 31–32 (5th Cir.1995), *cert. denied,* 516 U.S. 1059, 116 S.Ct. 736, 133 L.Ed.2d 686 (1996) ("it is difficult to see that any other deprivations in the prison context, short of those that clearly impinge on the duration of confinement, will henceforth qualify for constitutional 'liberty' status.... [T]he ambit of [inmates'] due process liberty claims has been dramatically narrowed.").

Indeed, several circuit courts have rejected prisoners' due process claims under *Sandin* where the deprivation complained of was solely confinement in segregated housing. *See, e.g., Pichardo v. Kinker,* 73 F.3d 612, 613 (5th Cir.1996) (indefinite confinement in administrative segregation for affiliation with gang not atypical and significant under *Sandin* ); *Luken v. Scott,* 71 F.3d 192, 193 (5th Cir.1995), *cert. denied,* 517 U.S. 1196, 116 S.Ct. 1690, 134 L.Ed.2d 791 (1996) (segregation without more implicates no liberty interest); *Rimmer–Bey v. Brown,* 62 F.3d 789, 790–91 (6th Cir.1995)(placement in administrative segregation not atypical and significant in context of life sentence).

**\*4** Several judges in this district have adopted this position. *See Polanco v. Allan,* No. 93–CV–1498, 1996 WL 377074, at \*2 (N.D.N.Y. July 5, 1996) (McAvoy, C.J.) (confinement in a special housing unit (SHU) for up to one year not protected by Due Process Clause); *Figueroa v. Selsky,* No. 91–CV–510 (N.D.N.Y. Oct. 5, 1995) (Scullin, J.) (seven and one-half months in SHU not protected); *Delaney v. Selsky,* 899 F.Supp. 923, 927 (N.D.N.Y.1995) (McAvoy, C.J.) (197 days in SHU not protected); *Ocasio v. Coughlin,* No. 94–CV–530 (N.D.N.Y. Feb. 5, 1996) (Scullin, J.) (180 days in SHU not protected); *Gonzalez v. Coughlin,* No. 94–CV–1119 (N.D.N.Y. Jan. 10, 1996) (Report–Recommendation of M.J. Hurd) (163 days in keeplock not protected), *adopted,* (N.D.N.Y. May 6, 1996) (Cholakis, J.), *appeal docketed,* No. 96–2494 (2d Cir. June 10, 1996); *Taylor v. Mitchell,* No. 91–CV–1445

Tinsley v. Greene, Not Reported in F.Supp. (1997)

1997 WL 160124

(N.D.N.Y. Feb. 5, 1996) (Cholakis, J.) (sixty days in SHU not protected); *Cargill v. Casey,* No. 95–CV–1620, 1996 WL 227859, at \*2 (N.D.N.Y. May 2, 1996) (Pooler, J.) (dismissing as frivolous complaint alleging due process violation resulting in keeplock confinement for thirty days). Under these cases, based solely on its duration, plaintiff*'*s confinement in keeplock for sixty days would not constitute a cognizable liberty interest under *Sandin.*

Other circuits, however, have viewed *Sandin* less as a durational, bright line bar to statement of a claim than as an additional issue of fact for litigation. *See, e.g., Bryan v. Duckworth,* 88 F.3d 431, 433–34 (7th Cir.1996) (question of fact whether disciplinary segregation was atypical and significant under *Sandin* ); *Williams v. Fountain,* 77 F.3d 372, 374 n. 3 (11th Cir.1996) (noting *Sandin* decided by only 5–4 majority and holding that segregation for one year provided basis for assuming atypical and significant deprivation under *Sandin* ); *Gotcher v. Wood,* 66 F.3d 1097, 1101 (9th Cir.1995) (placement in disciplinary segregation presents issue of fact whether it constitutes an atypical and significant deprivation under *Sandin* ).

The Second Circuit appears generally to be following the Seventh, Ninth and Eleventh Circuits. The Second Circuit has not yet definitively addressed the effect of *Sandin* on its prior holdings. *See Rodriguez v. Phillips,* 66 F.3d 470, 480 (2d Cir.1995). It has recently held, however, that *Sandin* does apply retroactively and, it appears, that a plaintiff bears the burden of proving that the deprivation in question imposed an atypical and significant hardship. *See Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996); *Samuels v. Mockry,* 77 F.3d 34, 37–38 (2d Cir.1996); *see also Giakoumelos v. Coughlin,* 88 F.3d 56, 62 (2d Cir.1996) (dicta that whether confinement in SHU is "atypical and significant" under *Sandin* presents question of fact). One judge in this district has concluded from these cases that fact-finding is required to resolve whether a deprivation is atypical and significant. *Compare Silas v. Coughlin,* No. 95–CV–1526, 1996 WL 227857, at \*1 (N.D.N.Y. April 29, 1996) (Pooler, J.) (denying motion to dismiss due process claim where plaintiff was confined in SHU for 182 days, holding that Second Circuit's interpretation of *Sandin* mandated further fact-finding as to nature of plaintiff's alleged deprivation from confinement), *with Cargill v. Casey, supra* (due process claim based on confinement in keeplock for thirty days dismissed as frivolous).

**\*5** Under these cases, consideration must be given to whether a plaintiff has established, or raised, a genuine question of fact concerning his disciplinary confinement. Here, plaintiff has raised no question of fact concerning his confinement in keeplock. Plaintiff has not alleged rare, unique or unusual hardships of the kind cited in *Sandin* as examples of atypical and significant deprivations. 515 U.S. at ——, 115 S.Ct. at 2300 (transfer to a mental hospital and involuntary administration of psychotropic drugs), or that detention in keeplock imposed a hardship on plaintiff because of his special, unique or unusual condition while incarcerated. *See Delaney v. Selsky,* 899 F.Supp. at 927–28 (question of fact whether confinement in SHU created atypical and significant deprivation for inmate who alleged such confinement caused back problems because of his unusual height of nearly seven feet).

Segregated confinement is a known and usual aspect of incarceration in the New York prison system. *See Sandin v. Conner,* 515 U.S. at ——, 115 S.Ct. at 2301 ("Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law."). The existence of keeplock has been authorized by statute, N.Y. Correct. Law § 112(1) (McKinney 1987), and implemented by DOCS regulations. N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995). Those regulations describe the conditions and restrictions of confinement in keeplock. *Id.* at pts. 302–05. The deprivations are, therefore, part of the New York prison "regime ... to be normally expected" by one serving a sentence in that system. *Sandin v. Conner,* 515 U.S. at ——, 115 S. Ct. at 2302.

Moreover. confinement in keeplock or SHU may result not only from the imposition of discipline, as here. Inmates may also be placed in keeplock or SHU for reasons of administration, N.Y. Comp.Codes R. & Regs. tit. 7, § 301.4(b) (1995); protection, *id.* at § 301.5; detention, *id.* at § 301.3; reception, diagnosis and treatment, *id.* at pt. 306; or for any other reason. *Id.* at 301.7(a). The conditions for inmates confined in keeplock, including plaintiff, are the same regardless of the reason for placement there. *Id.* at pts. 302–05. [5]

Inmates in the New York system have no right to be incarcerated in any particular institution, cell or block of cells, nor do they enjoy a right to be housed in the general prison population or to participate in any particular

Tinsley v. Greene, Not Reported in F.Supp. (1997)

1997 WL 160124

program offered at an institution. *Cf. Meachum v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (no right to remain in particular prison created by state law); *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (right to good time credits created by state statute). Such matters are committed to the discretion of prison authorities. This grant of broad discretion to prison authorities comports with a principle rationale of *Sandin* that

> federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment.... Such flexibility is especially warranted in the fine-tuning of the ordinary incidents of prison life, a common subject of prisoner claims....

*6 515 U.S. at ——– ——, 115 S.Ct. at 2299–2300.

Here, plaintiff contends at best that his keeplock confinement was "atypical and significant" under *Sandin* because it subjected him to retaliation, caused closer monitoring by DOCS, affected his transfer to other institutions, and impaired his eligibility for certain prison programs. Pl. Mem. of Law at p. 21. These contentions are conclusory and unsupported in any way. They are also unsworn and unsigned. For these reasons alone, plaintiff's contentions should be rejected as failing to raise any issue of fact under *Sandin.*

On their merits as well, however, these contentions should be rejected. While there may be cases where confinement in keeplock might subject an inmate to retaliation from other inmates or guards such that keeplock confinement imposed "atypical and significant" hardships, no such hardship has been demonstrated here by the non-specific, conclusory assertions of plaintiff. As to the contentions regarding plaintiff's monitoring status and his eligibility for transfer and prison programs, all concern matters for which plaintiff has no special rights or interests, all were known to follow from disciplinary confinement as a regular part of DOCS' regime, and plaintiff has asserted no hardship atypical or significant as to him concerning these matters.

For these reasons plaintiff has failed to meet his burden of demonstrating the existence of any factual issue under

*Sandin.* Accordingly, defendants' motion on this ground should be granted.

2. Due Process
Defendants assert that, notwithstanding *Sandin,* plaintiff was not denied due process.

The Due Process Clause requires that an inmate faced with disciplinary confinement has a right to at least twenty-four hours advance notice of the charges against him and to be informed of the reasons for the action taken and the evidence relied upon by the hearing officer. In addition, an inmate has the right to call witnesses and present evidence in his defense "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals." *Wolff v. McDonnell,* 418 U.S. 539, 564–66, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1983). These rights implicitly include the right to make a statement in the inmate's defense and the right to marshal the facts. *See Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *see also Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986).

Where an inmate is illiterate or where the charges are unusually complex, the inmate is entitled to seek the assistance of another inmate or an employee. *Wolff v. McDonnell,* 418 U.S. at 570. The Second Circuit has extended this right, and directed that inmates who are confined pending a hearing be provided with some form of assistance. *Eng v. Coughlin,* 858 F.2d 889, 897–98 (2d Cir.1988). Corrections officials are required only to provide inmates with the opportunity to exercise these due process rights. *See, e.g., Maiid v. Henderson,* 533 F.Supp. 1257, 1273 (N.D.N.Y.), *aff'd,* 714 F.2d 115 (2d Cir.1982) ("although [the inmate] had the right to call witnesses at his hearing, there is no evidence in the record that he ever invoked this right").

*7 Here, plaintiff argues first that the hearing officer failed to call witnesses in the requested order. However, due process does not mandate that plaintiff be permitted to call his witnesses in a particular order.

Second, plaintiff alleges that the hearing officer failed to conduct an in camera inquiry into the original source of information on which the search was authorized to determine if that source was reliable. However, the issues

Tinsley v. Greene, Not Reported in F.Supp. (1997)

1997 WL 160124

at the hearing were the results of the search, not the reasons why the search was initiated. The hearing officer's decision did not rest in any part on the information from the confidential informant. Due process thus did not require inquiry into the reliability of the original information.

Third, plaintiff contends that although the original misbehavior report contains the signatures of both defendant Yule and Officer Rando, his copy reflects only defendant Yule's signature. However, an inmate has no right to receive a statement of charges signed by any particular official. [6]

Fourth, plaintiff claims that defendant Roberts failed to provide him with various documents plaintiff requested pursuant to New York's Freedom of Information Law after the disciplinary hearing concluded. This claim as well falls outside the scope of the Due Process Clause as described by the cases discussed above. Defendants' failure to provide the requested documents did not violate plaintiff's constitutional right.

Accordingly, defendants' motion should be granted on this ground as well. [7]

3. Cell Search

Plaintiff alleges that the search of his cell on October 30, 1995 violated his Fourth Amendment protection against unreasonable searches and seizures. [8] In *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Supreme Court held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Id.* at 526. Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights. *DeMaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.1995) (Kaplan, J.). Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights. [9] Defendants' motion for summary judgment as to claims regarding the search of plaintiff's cell should be granted.

4. *Qualified Immunity*

Defendants argue in the alternative that they are entitled to summary judgment on the ground of qualified immunity.

A government official is entitled to qualified immunity if his or her conduct did not violate "a clearly established" constitutional right of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994). The contours of the right must be established to the extent that a reasonable official would recognize his acts violated that right. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The following factors must be considered to determine whether a right is clearly established:

> **\*8** (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question, and (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). A determination in favor of a public officer based on qualified immunity is appropriate when, at the time the officer was acting, the right in question was not clearly established or, even if the right was established, it was not objectively reasonable for the official to recognize that his conduct violated the right. *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993); *Ying Jing Gan v. City of New York,* 996 F.2d 522 (2d Cir.1993).

Here, among other reasons, the defendants could not reasonably have known that the search of plaintiff's cell violated any of his Fourth Amendment rights or that plaintiff's due process rights were violated by the failure to call witnesses in the order requested by plaintiff. *Cf. Walker v. Bates,* 23 F.3d 652, 656–57 (2d Cir.1994), *cert. denied,* 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995) (prison disciplinary hearing officer entitled to qualified immunity in suit claiming violation of due process from denial of prisoner's right to call witnesses in disciplinary hearing); *Cookish v. Powell,* 945 F.2d 441, 449 (1st Cir.1991) (prison official entitled to qualified immunity from charge of violating prisoner's Fourth

Tinsley v. Greene, Not Reported in F.Supp. (1997)

1997 WL 160124

Amendment rights by conducting body cavity search in view of prison guards of opposite sex). Therefore, the defendants' motion on this ground should be granted.


## III. APPOINTMENT OF COUNSEL

Also pending is a renewed application by plaintiff for appointment of counsel (Docket No. 21). A review of the file in this matter reveals that the issues in dispute in this case are not overly complex. Further, there has been no indication that plaintiff has been unable to investigate the critical facts of this case. Finally, no special reason appears why appointment of counsel at this time would be more likely to lead to a just determination of this litigation. Therefore, based upon the existing record in this case, appointment of counsel is unwarranted. [10]


## IV. CONCLUSION

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion for summary judgment be GRANTED; and it is further

RECOMMENDED that plaintiff's motion for summary judgment by default be DENIED; and it is hereby

ORDERED that plaintiff's renewed motion for appointment of counsel is DENIED without prejudice; and it is further

ORDERED that plaintiff's motion for a pre-trial conference and an evidentiary hearing is DENIED; and it is further

ORDERED that the Clerk of the Court serve a copy of this Report–Recommendation and Order, by regular mail, upon the parties to this action.

**\*9** Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).


## All Citations

Not Reported in F.Supp., 1997 WL 160124


## Footnotes

1   This matter was referred to the undersigned for report and recommendation by United States District Judge Rosemary S. Pooler pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2   "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995).

3   DOCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier III hearing, or superintendent's hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 254.7(iii), 270.3(a) (1995); *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994), *cert. denied,* 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995).

4   New York regulations permit placement in keeplock for both disciplinary and administrative reasons. These include, among others, punishment for misconduct and protective custody. N.Y. Comp.Codes R. & Regs. tit. 7, § 301.1–.7 (1995).

5   Inmates confined for reasons of protection receive somewhat greater privileges. *See, e.g.,* N.Y. Comp.Codes R. & Regs. tit. 7, § 330.4 (1995) (three hours per day outside cell).

6   A misbehavior report is to be made by the employee who has observed the incident. Where another employee has personal knowledge of the facts, he shall, where appropriate, endorse his name on the other employee's report. N.Y. Comp.Codes R. & Regs. tit. 7, § 251–3.1(b) (1995). The misbehavior report here was signed by J. Rando and endorsed by G. Yules as an employee witness, and it is endorsed by the area supervisor. *See* Defs.' Statement Pursuant to Rule 7.1(f), Ex. A, p. 1, Inmate Misbehavior Report.

**Tinsley v. Greene, Not Reported in F.Supp. (1997)**

1997 WL 160124

7     Throughout his complaint and pleadings, plaintiff refers jointly to his right to due process/equal protection. The facts and arguments in plaintiff's complaint and pleadings point only to a due process claim. No facts or arguments relating to the Equal Protection Clause are asserted. Nevertheless, to the extent plaintiff's complaint is deemed to assert a claim for violation of the Equal Protection Clause, defendants' motion for summary judgment should be granted as to that claim as well.

8     In his complaint plaintiff also appears to allege that the search violated his Fourteenth Amendment right to due process because he received a receipt for the seizure of the marijuana five hours after the search was conducted and never received any report of the search. To the extent plaintiff asserts such a claim, summary judgment should be granted to the defendants for the reasons set forth in subsections 1 and 2 above.

9     Nor can an inmate recover under section 1983 for intentional destruction of his personal property by a state employee, as long as the state provides a meaningful post-deprivation remedy. *Hudson v. Palmer,* 468 U.S. at 533. New York provides such a remedy in section 9 of the New York Court of Claims Act. *Smith v. O'Connor,* 901 F.Supp. 644, 647 (S.D.N.Y.1995). Plaintiff may pursue any claim regarding destruction of his personal property in state court.

10     Also pending is plaintiff's motion for a pre-trial conference and evidentiary hearing (Docket No. 23). This motion is untimely and is hereby denied. Plaintiff has also moved for summary judgment by default (Docket No. 11) in response to defendants' request for an extension of time to answer the complaint. This extension was granted by order dated March 15, 1996 and defendants have answered. Accordingly, it is recommended that this motion be denied as moot.

---

**End of Document**           © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Williams v. Keane, Not Reported in F.Supp. (1997)

1997 WL 527677

KeyCite Yellow Flag - Negative Treatment

Distinguished by Carrigan v. Davis, D.Del., September 28, 1999

1997 WL 527677
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jack WILLIAMS, Plaintiff,

v.

J.P. KEANE, Superintendent, J. BUONATO,
Lieutenant, P. GIBSON, Lieutenant
and J. BUMP, Corrections Officer, Sing
Sing Correctional Facility, Defendants.

No. 95 CIV. 0379 AJP JGK.
|
Aug. 25, 1997.

*OPINION AND ORDER*

PECK, United States Magistrate Judge.

**\*1** In this 42 U.S.C. § 1983 action, pro se plaintiff Jack Williams has sued the Superintendent, two Lieutenants and a Corrections Officer at the Sing Sing Correctional Facility for alleged violations of due process, equal protection and cruel and unusual punishment in connection with an alleged sexual assault during a "pat-frisk," and Williams' subsequent alleged seven-day (actually six-day) keeplock confinement.

The parties have consented to disposition of this action by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

Presently before the Court is defendants' summary judgment motion. Under *Sandin v. Conner* and its progeny, seven days in keeplock does not state a constitutional claim for violation of due process. Under the Second Circuit's recent decision in *Boddie v. Schnieder*, Williams' allegation of sexual fondling during a single pat-frisk is not sufficiently egregious to state a harm of federal constitutional proportions under the Eighth Amendment. Accordingly, for the reasons set forth below, the Court grants defendants' summary judgment motion.

*FACTS*

*The Alleged Incident*

On November 15, 1994, at approximately 1:15 P.M., a metal detector was set off as plaintiff Jack Williams left the mess hall with several other inmates. (Williams Dep. at 29, 43; Defs' Rule 56.1 Stmt. ¶¶ 29-33.) Williams and other inmates were ordered to stand up against the wall for a routine "pat-frisk" and search for contraband. (Williams Dep. at 29-30; Bump Aff. ¶¶ 10-13; Defs' Rule 56.1 Stmt. ¶¶ 32-33.) It is undisputed that pat-frisks are a normal occurrence in prisons, especially for prisoners exiting the mess hall where metal utensils are used. (Williams Dep. at 29-31; Williams 3(g) Stmt. ¶ 10; Gibson Aff. ¶¶ 6-7; Bump Aff. ¶¶ 5-7; Defs' Rule 56.1 Stmt. ¶¶ 11, 13-24, 34; Defs' Ex. D: DOCS Directive No. 4910.)

However, the nature and extent of defendant Officer Bump's pat-frisk on Williams is disputed. Williams testified:

> I had my hands up against the wall. He started fondling my chest. He went down, opened my pants up, put his hands down my pants, starts feeling me, but to keep repeatedly doing that. He felt my testicles, kept doing that. At the same time I was moving down the wall. I was telling him, "What are you doing?" You know, I got kind of hostile with him and other officers, they intervened and told me leave, told him to stop the procedure, told me to leave the mess hall, which I left, but I got his name before I left and wrote it up.

(Williams Dep. at 30; *see also id.* at 43-44). In contrast, Officer Bump stated that he conducted a routine pat-frisk of Williams that involved a "limited physical touching of the inmate's groin area, from the outside with clothes on, and genitals, which is a prime spot for hiding weapons and other contraband." (Bump Aff. ¶ 13.) Bump also stated that "[a]t no time did I 'fondle' or touch Mr. Williams sexually." (Bump Aff. ¶ 18.)

**\*2** Later that day, Officer Bump issued a misbehavior report for Williams' hostile, aggressive, and uncooperative behavior during the pat-frisk. (Bump Aff. ¶¶ 14-15; Defs' Ex. C at p. 6: Inmate Misbehavior Report.) Officer Bump's Inmate Misbehavior Report states:

**Williams v. Keane, Not Reported in F.Supp. (1997)**

1997 WL 527677

I gave him a direct order to place his hands on the wall and spread his legs -- and he refused to comply by continuously moving down the wall, and removing his hands. He eventually did comply when an additional officer stepped to him. Inmate Williams ... repeatedly cursed me by calling me "a mother fucker and a goddamn faggot." As a result of this inmate's action this misbehavior report is submitted.

(Defs' Ex. C.) Williams admits asking whether Bump was gay, but denies cursing at him. (Williams Dep. at 44.)

The Misbehavior Report, or "ticket," was then given to defendant Lieutenant Buonato [1] for review. (Bump Aff. ¶ 19; Defs' Rule 56.1 Stmt. ¶ 42.) In accordance with prison policy, the "review lieutenant" determines whether the allegations on the ticket support the charge and, if so, warrant the inmate's placement in keeplock. (Buonato Aff. ¶ 5; Defs' Rule 56.1 Stmt. ¶ 43; *see* Williams Dep. at 46.) Lieutenant Buonato filed his review on November 16, 1994, concluding that the charges were adequately set forth and that a Tier II disciplinary hearing was warranted. (Buonato Aff. ¶¶ 7-10; Defs' Rule 56.1 Stmt. ¶ 43.)

*Williams' Placement in Keeplock and Subsequent Hearing*
Williams was placed in keeplock on November 16, 1994, the day he received a copy of the Inmate Misbehavior Report and the day after the incident. (Williams Dep. at 32-33, 39-40; Defs' Rule 56.1 Stmt. ¶ 44.)

Prison guidelines provide that a hearing on the charges must be held as soon as practical, but in no case longer than seven days from when the inmate is placed in keeplock. *See* 7 N.Y.C.R.R. § 251-5.1. (*See also* Williams Dep. at 50-51; Cplt. ¶ IV (C).) [2]

Williams Tier II hearing took place on November 21, 1994 at 3:00 P.M. (Defs' Rule 56.1 Stmt. ¶¶ 47, 49; Gibson Aff. ¶ 11; Defs' Ex. C at p. 1; Williams Dep. at 40.) Defendant Lieutenant Gibson [3] found Williams not guilty at the conclusion of the Tier II disciplinary hearing. (Defs' Rule 56.1 Stmt. ¶ 51; Gibson Aff. ¶¶ 13, 15-16; Williams Dep. at 41-42; Defs' Ex. C at p. 1.) Lieutenant Gibson stated on the record that Williams was uncomfortable with the search, especially "where he was being touched." (Gibson Aff. ¶ 15; Defs' Rule 56.1 Stmt. ¶ 53; Defs' Ex. C at p. 2.)

Gibson also found that Officer Bump conducted himself within the scope of his official duties and in accordance with prison rules. (Defs' Rule 56.1 Stmt. ¶ 54; Gibson Aff. ¶ 17.) Williams characterized Lieutenant Gibson's hearing as "fair." (Williams Dep. at 58, 60; Gibson Aff. ¶ 18; Defs' Rule 56.1 Stmt. ¶ 55.)

**\*3** Williams was released from keeplock on November 21, 1994. (Williams Dep. at 42-43, 51, 53.) While Williams alleges that he spent seven days in keeplock (Cplt. ¶ IV(D); Williams Dep. at 51, 62; *see* Defs' Rule 56.1 Stmt. ¶ 48), it appears that Williams was in keeplock for six days (November 16 to November 21).

Williams named Superintendent Keane as a defendant, alleging that Keane did not properly train the corrections officers under his control. (Cplt. ¶ IV(E).) Keane also conducted an internal facility investigation into Officer Bump's conduct, which found that Bump complied with all prison rules. (Defs' Rule 56.1 Stmt. ¶¶ 58-59; Keane Aff. ¶¶ 11-12.)

*ANALYSIS*

To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. *See* 42 U.S.C. §1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55 (1988). "Section 1983 itself," however, "createsno substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S. Ct. 2749 (1994); *accord, e.g., Ruiz v. Selsky,* 96 Civ. 2003, 1997 WL 137448 at \*4 (S.D.N.Y. March 24, 1997) (Peck, M.J.); *Morris v. Dann,* No. 95-CV-975, 1996 WL 732559 at \*3 (N.D.N.Y. Dec. 11, 1996). Proof that state procedural law was violated does not by itself constitute a deprivation of due process because "[f]ederal constitutional standards rather than state law define the requirements of procedural due process." *Russell v. Coughlin,* 910 F.2d 75, 78 n.1 (2d Cir. 1990); *accord, e.g., Ruiz v. Selsky,* 1997 WL 137448 at \*4.

I. *UNDER SANDIN V. CONNER, SIX DAYS IN KEEPLOCK DOES NOT CONSTITUTE AN*

Williams v. Keane, Not Reported in F.Supp. (1997)

1997 WL 527677

*ATYPICAL AND SIGNIFICANT DEPRIVATION OF A PROTECTED LIBERTY INTEREST*

A. *Sandin v. Conner*

Defendants' summary judgment motion on the keeplock claim turns, in part, on application of the Supreme Court's decision in *Sandin v. Conner,* 515 U.S. 472, 115 S. Ct. 2293 (1995), which significantly changed the prisoner due process landscape. The Supreme Court there held:

> [W]e believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause. The time has come to return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum.* Following *Wolff,* we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

**\*4** 115 S. Ct. at 2300 (fn. & citations omitted).

In *Sandin,* the prisoner was charged with a disciplinary infraction for physical interference with a correction officer, for using abusive or obscene language and for harassing employees. *Id.* at 2295-96. The disciplinary committee refused the prisoner's request to present witnesses, found him guilty of the alleged misconduct and sentenced him to 30 days disciplinary segregation in the prison's Special Holding Unit (SHU). *Id.* The Supreme Court found that the inmate was not entitled to the procedural protections set forth in *Wolff v. McDonnell,* 418 U.S. 539, 94 S. Ct. 2963 (1974). *Sandin v. Conner,* 115 S. Ct. at 2302. The Supreme Court stated:

> *We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest.* The record shows that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody. We note also that the State expunged Conner's disciplinary record with respect to the "high misconduct" charge 9 months after Conner served time in segregation. Thus, Conner's confinement did not exceed similar, but totally discretionary confinement in either duration or degree of restriction. Indeed, the conditions at Halawa [prison] involve significant amounts of "lockdown time" even for inmates in the general population. *Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.*

*Id.* at 2301 (footnotes omitted and emphasis added).

As a result of *Sandin,* the Second Circuit has announced a two-part standard which prisoners must satisfy to establish a procedural due process claim due to segregated confinement:

> To prevail, [the plaintiff inmate] must establish both that [1] the confinement or restraint creates an "atypical and significant hardship" under *Sandin,* and that [2] the state has granted its inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement or restraint.

*Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir. 1996); *accord,e.g., Santana v. Keane,* 90 Civ. 6309, 1996 WL 465751 at \*3 (S.D.N.Y. Aug. 14, 1996). A prisoner who satisfies both of these elements would be entitled to the procedural due process protections enunciated by *Wolff v. McDonnell,* 418 U.S. at 556-58, 94 S. Ct. at 2974-75, and its progeny. *See, e.g., Barnes v. Starks,* 95 Civ. 4891, 1996 WL 648956 at \*3 & n.4 (S.D.N.Y. Nov. 6, 1996); *Santana v. Keane,* 1996 WL 465751 at \*3 & n.1.

Williams v. Keane, Not Reported in F.Supp. (1997)

1997 WL 527677

### B. *Williams' Action Fails Because It Is Based on A Miscalculation of the Time He Spent in Keeplock*

**\*5** Williams notes, correctly, that New York's prison regulations require a disciplinary hearing to be held within 7 days of the inmate's placement in keeplock for a disciplinary infraction. 7 N.Y.C.R.R. § 251-5.1. Williams then argues, incorrectly, that he spent 7 days in keeplock before the disciplinary hearing at which he was found not guilty and immediately released from keeplock. (*See* Williams Dep. at 50-51; Cplt. ¶ IV (C).) In fact, however, the incident occurred on November 15, 1994, Williams was placed in keeplock on November 16, and his hearing was held and he was released from keeplock on November 21, 1994. (*See* Fact section, above.) Thus, on the undisputed facts, Williams was in keeplock from November 16 to November 21, at most *six* days. Accordingly, the hearing was held and Williams was released from keeplock within the seven days required by New York's prison regulations. Since the regulations were not violated, it is not necessary to examine either prong of the two-prong *Sandin* analysis; defendants are entitled to summary judgment on the keeplock claim. *See Soto v. Walker,* 44 F.3d 169, 173 (2d Cir. 1995) (even a violation of 7 N.Y.C.R.R. § 251-5.1 "alone would not be enough generally to establish a constitutional claim"); *Dudley v. Coombe,* 96 Civ. 1665, 1997 WL 423074 at \*2 (S.D.N.Y. July 28, 1997) (in light of 7 N.Y.C.R.R. § 251-5.1 requiring hearing within seven days, prisoner did not have liberty interest in five-day keeplock stay without hearing).

### C. *Application of Sandin to Confinement of 6 Days in Keeplock*

Even if the Court were to assume, contrary to the undisputed evidence, that Williams' keeplock stay violated state regulations, defendants are entitled to summary judgment under the first prong of the *Sandin* analysis.

In recent decisions, the Second Circuit has clearly instructed that the *Sandin* analysis requires a factual inquiry as to the length and conditions of confinement:

> The language and analysis in *Sandin* make clear that the Court did not intend to suggest that discipline in segregated confinement could never present such an "atypical, significant deprivation." ... [W]e now state explicitly: *Sandin* did not create a

per se blanket rule that disciplinary confinement may never implicate a liberty interest.... [D]istrict courts must examine the circumstances of a confinement to determine whether that confinement affected a liberty interest.

**\*6** *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir. 1997); *see also, e.g., Sealey v. Giltner,* 116 F.3d 47, 52 (2d Cir. 1997); *Brooks v. Difasi,* 112 F.3d 46 (2d Cir. 1997).

While the courts have not yet determined what length of confinement will constitute an "atypical or significant hardship," the decisions in the Second Circuit are unanimous that keeplock or SHU confinement of 30 days or less in New York prisons is *not* "atypical or significant hardship" under *Sandin. See, e.g., Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir. 1996) (12 days in SHU); *Johnson v. Coughlin,* 90 Civ. 1731, 1997 WL 431065 at \*1 (S.D.N.Y. July 30, 1997) (8 days confinement prior to disciplinary hearing); *Sullivan v. Schweikhard,* 95 Civ. 0276, 1997 WL 349983 at \*3 (S.D.N.Y. June 25, 1997) (9 days in keeplock); *Duncan v. Keane,* 95 Civ. 1090, 1997 WL 328070 at \*2 (S.D.N.Y. June 13, 1997) (30 days keeplock); *Harris v. Keane,* 962 F. Supp. 397, 404 (S.D.N.Y. 1997) (23 days in keeplock; the "Second Circuit's post-Sandin decisions are unanimous that keeplock of 60 days or less in New York prisons is not an "atypical hardship.'"); *Saulter v. Hanslmaier,* 94 Civ. 6855, 1997 WL 177887 at \*2 (S.D.N.Y. April 14, 1997) (7 days in keeplock); *Ragland v. Crawford,* 95 Civ. 10069, 1997 WL 53279 at \*3 (S.D.N.Y. Feb. 7, 1997) (1 day in keeplock); *Torres v. Keane,* 94 Civ. 4845, 1997 WL 35507 at \*1 (S.D.N.Y. January 30, 1997) (21 days in keeplock); *Grant v. Riley,* 89 Civ. 0359, 1996 Wl 727441 at \*2-3 (S.D.N.Y. Dec. 17, 1996) (10 days in keeplock, only 5 of which were served); *Barnes v. Starks,* 95 Civ. 4891, 1996 WL 648956 at \*3 (S.D.N.Y. Nov. 6, 1996) (21 days in keeplock); *Santana v. Keane,* 90 Civ. 6309, 1996 Wl 465751 at \*5 (S.D.N.Y. Aug. 14, 1996) (9 days in keeplock during a prison sentence of at least 7 years); *Pampalone v. Young,* 95 Civ. 2348, 1996 WL 511569 at \*3 (S.D.N.Y. August 7, 1996) (Peck, M.J.) (10 days in keeplock); *McAllister v. Zydel,* 929 F. Supp. 102, 104 (W.D.N.Y. 1996) (15 days in keeplock); *Chambers v. Coughlin,* 95 Civ. 298, 1996 WL 243202 at \*2 & n.6 (S.D.N.Y. May 10, 1996) (7 days in SHU); *Beaty v. Scully,* 92 Civ. 3407, 1996 WL 209933 at \*2 (S.D.N.Y. April 30, 1996) (11 days in SHU); *Slaughter v. Coughlin,* 94 Civ. 6734, 1996 WL 200308 at \*3 (S.D.N.Y. April 25, 1996) (10

Williams v. Keane, Not Reported in F.Supp. (1997)

1997 WL 527677

or 11 days in keeplock); *Leyro v. Kennedy,* 95 Civ. 0198, 1996 WL 191741 at *1 (S.D.N.Y. April 22, 1996) (several days in keeplock); *Ramirez v. Coughlin,* 93 Civ. 0765, 1996 WL 194324 at *3-4 (S.D.N.Y. April 22, 1996) (30 days combination of SHU and keeplock); *Dawkins v. Healy,* 94 Civ. 6382, 1996 WL 145989 at *2 (S.D.N.Y. April 1, 1996) (15 days in keeplock) *judgment vacated and reconsideration in part, 1996* WL 280737 at *2 (S.D.N.Y. May 28, 1996) (reconsideration limited to issue of retaliation); *Powell v. Scully,* 92 Civ. 5334, 1996 WL 145962 at *3 (S.D.N.Y. April 1, 1996) (7 days of cell confinement); *Benton v. Keane,* 921 F. Supp. 1078, 1079 (S.D.N.Y. 1996) (9 days in administrative confinement); *Ketchmore v. Stormer,* 94 Civ. 8271, 1996 WL 117572 at *2-3 (S.D.N.Y. March 18, 1996) (10 days of cell confinement); *Moolenaar v. Finn,* 94 Civ. 6778, 1996 WL 112200 at *3 (S.D.N.Y. March 14, 1996) (15 days in keeplock); *Walker v. Mahoney,* 915 F. Supp. 548, 553-54 (E.D.N.Y. 1996) (23 days in administrative segregation) (citing unpublished 2d Cir. dispositions); *Ahlers v. Keane,* 94 Civ. 3297, 1995 WL 375920 (S.D.N.Y. June 22, 1995) (10 days keeplock), *aff'd* (unpublished decision), 101 F.3d 684, No. 95-2454, 1996 WL 281351 at *1 (2d Cir. May 22, 1996); *Martin v. Mitchell,* 92-CV-716, 1995 WL 760651 at *3 (N.D.N.Y. Nov. 24, 1995) (30 days keeplock); *Schmelzer v. Norfleet,* 903 F. Supp. 632, 634-35 (S.D.N.Y. 1995) (11 days in keeplock); *Jackson v. Keane,* 93 Civ. 6453, 1995 WL 622593 at *3 (S.D.N.Y. Oct. 24, 1995) (14 days in SHU); *Kozlek v. Papo,* 94 Civ. 1429, 1995 WL 479410 at *2 (S.D.N.Y. Aug. 11, 1995) (10 days in SHU); *Uzzell v. Scully,* 893 F. Supp. 259, 262-63 (S.D.N.Y. 1995) (23 days in keeplock).

**\*7** Indeed, decisions in this Circuit have held that keeplock or SHU confinement of longer than 30 days does not implicate a liberty interest. *See, e.g., Frazier v. Coughlin,* 81 F.3d at 317-18 (12 days in SHU and eleven months in "close supervision unit"); *Thompson v. Keane,* 95 Civ. 2442, slip op. at 5-6 (S.D.N.Y. Aug. 6, 1997) (91 days in SHU); *Ruiz v. Selsky,* 96 Civ. 2003, 1997 WL 137448 at * 5 (S.D.N.Y. March 24, 1997) (Peck, M.J.) (192 days in SHU during 10-20 year prison sentence); *Reaves v. Williams,* 95 Civ. 0281, 1997 WL 10132 at *4-5 (S.D.N.Y. Jan. 10, 1997) (90 days of keeplock imposed, of which 69 days were served); *Odom v. Keane,* 94 Civ. 8032, 1997 WL 3262 at *1 (S.D.N.Y. Jan. 6, 1997) (46 days of keeplock); *Coleman v. Galgano,* 95 Civ. 5835, 1996 WL 715533 at *1, 3 (S.D.N.Y. Dec. 11, 1996) (60 days in SHU and 180 days in keeplock); *Whitfield v. Scully,* 94 Civ. 3290, 1996 WL 706932 at *5 (S.D.N.Y. Dec. 6, 1996) (60 days in SHU); *Bennett v. Dolan,* 93 Civ. 5215, 1996 WL 499519 at *1, 3 (S.D.N.Y. Sept. 4, 1996) (45 days of keeplock imposed, 24 days served); *Nogueras v. Coughlin,* 94 Civ. 4094, 1996 WL 487951 at *5 (S.D.N.Y. Aug. 27, 1996) ("210 days in SHU does not in and of itself trigger due process concerns."); *Duncan v. Keane,* 93 Civ. 6026, 1996 WL 511573 at *3-5 (S.D.N.Y. Aug. 22, 1996) (Peck, M.J.) (58 days in keeplock); *Brown v. McClellan,* 93-CV-0901, 1996 WL 328209 at *5 (W.D.N.Y. June 11, 1996) (two confinements in SHU for 60 days each); *Guzman v. Kelly,* 88-CV-1391, 1996 WL 291985 at *3 (W.D.N.Y. May 28, 1996) (8 months in SHU); *Trice v. Clark,* 94 Civ. 6871, 1996 WL 257578 at *2-3 (S.D.N.Y. May 16, 1996) (150 days in SHU); *Arce v. Coughlin,* 93 Civ. 4702, 1996 WL 252371 at *6-7 (S.D.N.Y. May 14, 1996) (120 days in SHU); *Camacho v. Keane,* 95 Civ. 0182, 1996 WL 204483 at *2 (S.D.N.Y. April 25, 1996) (90 days, only 40 days of which were served, in keeplock); *Roucchio v. Coughlin,* 923 F. Supp. 360, 373 (E.D.N.Y. 1996) (47 days in SHU) (citing cases, including unpublished 2d Cir. decisions upholding 60 days SHU and 71 days segregated confinement); *Villano v. Irvin,* 93-CV-0196, 1996 WL 343251 at *3 (W.D.N.Y. March 18, 1996) (85 days in keeplock out of a 90-day keeplock sentence); *White v. Artuz,* 94 Civ. 4592, 1996 WL 84498 at *2 (S.D.N.Y. Feb. 27, 1996) (55 days in protective custody); *Walker v. Mahoney,* 915 F. Supp. 548, 553-54 (S.D.N.Y. 1996) (23 days in administrative segregation) (citing unpublished 2d Cir. dispositions upholding 60 and 71-day confinements); *Rivera v. Coughlin,* 92 Civ. 3404, 1996 WL 22342 at *4-5 & n.6 (S.D.N.Y. Jan. 22, 1996) (89 days in disciplinary segregation; loss of good time credits reversed administratively so no effect on length of sentence); *Rosario v. Selsky,* 94 Civ. 6872, 1995 WL 764178 at *5-6 (S.D.N.Y. Dec. 28, 1995) (120 days imposed but inmate served less than 3 months in SHU during a ten-year sentence); *Tulloch v. Coughlin,* 91-CV-0211, 1995 WL 780970 at *1-2 (W.D.N.Y. Dec. 22, 1995) (180 days in SHU; loss of good time allowance restored through prior state proceeding; implies that any SHU confinement, regardless of length, is permissible under *Sandin*), *appeal dismissed on other grounds* (unpublished decision), 101 F.3d 1393, 1996 WL 414457 (2d Cir. 1996); *Morales v. Santor,* 94-CV-217, 1995 WL 760625 at *2 (N.D.N.Y. Dec. 4, 1995) (60 days in keeplock); *Ross v. Jewett,* 91-CV-1414, 1995 WL 760675 at *2, *4 (N.D.N.Y. Nov. 27, 1995) (60 days in keeplock), *aff'd* (unpublished decision), No. 96-2004, 1996 WL 304752 (2d Cir. June 7,

**Williams v. Keane, Not Reported in F.Supp. (1997)**

1997 WL 527677

1996); *Zamakshari v. Dvoskin,* 899 F. Supp. 1097, 1108 (S.D.N.Y. 1995) (Peck, M.J.) (60 days in SHU); *Delaney v. Selsky,* 899 F. Supp. 923, 927-28 (N.D.N.Y. 1995) (365 days in SHU ordinarily not atypical but because plaintiff over 7 feet tall and SHU bed too small for him, summary judgment denied); *Medina v. Bartlett,* 94-CV-0358, 1995 WL 529624 at *2 (W.D.N.Y. Aug. 28, 1995) (no liberty interest created by 2,555 days in SHU); *McMiller v. Wolf,* 94 Civ. 0623, 1995 WL 529620 at *1, *3 (W.D.N.Y. Aug. 28, 1995) (365 days in SHU reduced to approximately 180 days in SHU); *Carter v. Carriero,* 905 F. Supp. 99, 104 (W.D.N.Y. 1995) (360 days reduced to 270 days in SHU); *Hutchinson v. Adorno,* 93 Civ. 3949, 1994 WL 549568 (S.D.N.Y. Oct. 6, 1994), *aff'd* (unpublished decision), No. 94-2652, 1995 WL 737493 at *1-2 (2d Cir. Dec. 13, 1995) (1 year of segregated confinement and 90 days keeplock, reduced to 71 days in segregated confinement).

**\*8** Chief Judge McAvoy of the Northern District of New York concluded that "courts in this and other districts have subsequently [to *Sandin*] ruled that increasingly lengthy periods of segregated housing did not impose an 'atypical and significant hardship' within the meaning of *Sandin.* Indeed, *it now appears that any period of segregation of one year or less affords no protected liberty interest.*" *Polanco v. Allan,* No. 93-CV-1498, 1996 WL 250237 at *3 (N.D.N.Y. May 6, 1996) (emphasis added) (365 days in SHU upheld), *reaffirmed on reconsideration,* 1996 WL 377074 at *2 (N.D.N.Y. July 5, 1996) ("the general rule of a year or less seems appropriate, absent extraordinary circumstances, which plaintiff has not offered"; 365 days in SHU was not "outside the parameters of plaintiff's sentence"). [4]

Consistent with the above-cited cases, whatever *Sandin*'s outer limits, it is clear that Williams' confinement of 6 days [5] in keeplock does not constitute an "atypical or significant hardship" under *Sandin.* [6] Accordingly, the Court grants defendants' summary judgment motion on this first issue.

## II. *UNDER BODDIE v. SCHNEIDER, WILLIAMS'S ALLEGATION OF SEXUAL ABUSE DOES NOT RISE TO A CONSTITUTIONAL DEPRIVATION*

### A. *In Boddie v. Schnieder, the Second Circuit Recognized an Eighth Amendment Claim for Sexual Abuse*

**\*9** Williams' second claim, for alleged sexual abuse by Corrections Officer Bump, is governed by the Second Circuit's recent decision in *Boddie v. Schnieder,* 105 F.3d 857 (2d Cir. 1997), which recognized a § 1983 Eighth Amendment [7] claim for sexual abuse by a corrections officer, but also found the complaint of conduct there to not involve a harm of federal constitutional proportions. The same is true of Williams' claim here.

In *Boddie,* the Second Circuit recognized that the "Eighth Amendment sets constitutional boundaries on the conditions of imprisonment. The 'unnecessary and wanton infliction of pain' on a prisoner constitutes cruel and unusual punishment in violation of the Eighth Amendment." *Id.* at 861. The Eighth Amendment proscribes more than physically barbarous punishments. The Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity and decency,' against which we must evaluate penal measures." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S. Ct. 285, 290 (1976) (citations omitted).

*Boddie* reiterated a two-prong, objective-subjective test for Eighth Amendment violations, including claims of sexual abuse:

> An official violates the Eighth Amendment when two requirements are met. First, the alleged "punishment" must be, "objectively, sufficiently serious." Under the objective standard, "conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." Second, the prison official involved must have a "sufficiently culpable state of mind." Because sexual abuse by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims.

*Boddie,* 105 F.3d at 861 (citations omitted, including to *Farmer v. Branham,* 511 U.S. 825, 834, 114 S. Ct. 1970, 1977 (1994)). [8]

**\*10** Objectively, "[s]exual abuse may violate contemporary standards of decency and can cause severe physical and psychological harm," and "has no legitimate penological purpose." *Boddie,* 105 F.3d at 861. As to the subjective prong of the test, "[w]here no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in

Williams v. Keane, Not Reported in F.Supp. (1997)

1997 WL 527677

some circumstances, be sufficient evidence of a culpable state of mind." *Id.*

The Second Circuit in *Boddie* nevertheless affirmed the district court's dismissal of Boddie's claim:

> [A]llegations of sexual abuse may meet both the subjective and the objective elements of the constitutional test, thereby stating an Eighth Amendment claim under Section 1983. However, we agree with the district court that Boddie nevertheless failed to state an Eighth Amendment claim. He asserts a small number of incidents in which he allegedly was verbally harassed, touched, and pressed against without his consent. No single incident that he described was severe enough to be "objectively, sufficiently serious." Nor were the incidents cumulatively egregious in the harm they inflicted. The isolated episodes of harassment and touching alleged by Boddie are despicable and, if true, they may potentially be the basis of state tort actions. But they do not involve a harm of federal constitutional proportions as defined by the Supreme Court.

*Boddie,* 105 F.3d at 861. [9]

**B.** *Williams' Allegation of Sexual Abuse Fails to State a Valid Claim Under § 1983*

**\*11** Williams' allegations, like Boddie's, are not sufficient to state a valid § 1983 claim for sexual abuse. The conduct alleged by Williams, accepting his allegations as true, is no more egregious than the conduct in *Boddie.* Moreover, the instant case involves only a single incident of alleged abuse, whereas *Boddie* involved several. Thus, under *Boddie,* it is clear that Williams' claim does "not involve a harm of federal constitutional proportions as

defined by the Supreme Court." *Boddie,* 105 F.3d at 861; *see also, e.g., Green v. Elias,* 9 F.3d 1551 (9th Cir. 1993) (affirms grant of summary judgment to defendant correction officer where male prisoner alleged female guard grabbed his genitals during a clothed pat frisk of inmates leaving the dining hall); *Kaestner v. Mitchell,* No. C 96-2370, 1996 WL 428357 at \*1 (N.D. Cal. July 24, 1996) (alleged unwarranted sexual advances including touching of prisoner's buttocks "does not rise to the level of egregious, pervasive and/or widespread sexual harassment necessary to implicate the Eighth Amendment."); *Duncan v. Keane,* 95 Civ. 1090, 1995 WL 649931 at \*5-6 (S.D.N.Y. Nov. 6, 1995) (claim that correction officer felt plaintiff's rear end does not provide sufficient facts to state Eighth Amendment claim); *Friedman v. Young,* 702 F. Supp. 433, 434, 436 (S.D.N.Y. 1988) (complaint that correction officer fondled plaintiff's genitals and anus during pat search dismissed; "[a]ccepting the allegations of the complaint [as true], the line between a pat down and a fondle is too insubstantial to support the burden of supporting a claim for constitutional tort.").

Accordingly, accepting for purposes of this motion Williams' version of the facts, this isolated incident during a routine pat-frisk fails to state an Eighth Amendment claim under *Boddie.* The Court grants defendants' summary judgment motion on this second issue.

*CONCLUSION*

For the reasons set forth above, defendants' summary judgment motion is granted. The Clerk of the Court is directed to enter judgment for defendants dismissing this action with prejudice.

SO ORDERED.

DATED:

**All Citations**

Not Reported in F.Supp., 1997 WL 527677

Footnotes

Williams v. Keane, Not Reported in F.Supp. (1997)

1997 WL 527677

1     Williams named Lieutenant Buonato as a defendant because he allegedly improperly reviewed the misbehavior report and unjustifiably placed Williams in keeplock. (Cplt. ¶ IV (E); Williams Dep. at 49-50; *compare* Buonato Aff. ¶¶ 7-10.)

2     Section 251-5.1 provides:

> Where an inmate is confined pending a disciplinary hearing or superintendent's hearing, the hearing must be commenced as soon as is reasonably practicable following the inmate's initial confinement pending said disciplinary hearing or superintendent's hearing, but, in no event may it be commenced beyond seven days of said confinement without authorization of the commissioner or his designee.

> 7 N.Y.C.R.R. § 251-5.1.

3     Williams named Lieutenant Gibson as a defendant because Williams alleges that the hearing should have been held within the 7-day period required by state law. (Cplt. ¶ IV (E); Williams Dep. at 51.)

4     *But see Wright v. Miller,* 96 Civ. 1224, 1997 WL 438795 at *3 (slip op. at p. 6) (S.D.N.Y. July 31, 1997) (12-15 months in SHU may create atypical and significant hardship; summary judgment denied); *Porter v. Coughlin,* 964 F. Supp. 97, 103 (W.D.N.Y. 1997) (36 months in SHU creates liberty interest); *Bishop v. Keane,* 92 Civ. 6061, 1995 WL 384443 at *3 n.4 (S.D.N.Y. June 28, 1995) (whether 87 days in keeplock imposes atypical or significant hardship is a question of fact precluding summary judgment); *Lee v. Coughlin,* 902 F. Supp. 424, 431 (S.D.N.Y. 1995) (376 days in SHU imposed an "atypical and significant hardship" for an inmate serving a 2-year sentence), *motion for reconsideration granted, Lee v. Coughlin,* 914 F. Supp. 1004, 1005 (S.D.N.Y. 1996) (reconsideration granted for defendants to address recent *Sandin* decision); *Williams v. Fountain,* 77 F.3d 372, 374 n.3, 376 (11th Cir.) (assumes that a year of solitary confinement is a substantially "atypical and significant hardship" entitling plaintiff to due process, but finds that prisoner received sufficient due process), *cert. denied,* 117 S. Ct. 367 (1996).

5     The Court's analysis would be no different if plaintiff had spent 7 days in keeplock as Williams originally alleged.

6     Because Williams has not established the first *Frazier* prong (that his 6 day keeplock confinement is an atypical and significant hardship under *Sandin*), the Court need not reach the second *Frazier* prong (of whether New York has granted its inmates a liberty interest in being free of disciplinary confinement).

7     The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."

8     *See also Mathie v. Fries,* No. 1274, Docket 96-9138, 1997 WL 426567 at *3 (2d Cir. July 31, 1997), *affirming* 935 F. Supp. 1284, 1299 (E.D.N.Y. 1996) (pretrial detainee awarded damages for sexual assault including sodomy by prison official). Decisions in other circuits similarly recognize a § 1983 Eighth Amendment claim for serious sexual abuse by prison personnel. *See, e.g., Freitas v. Ault,* 109 F.3d 1335 (8th Cir. 1997) (to prove a constitutional claim for sexual abuse, the inmate must demonstrate that the alleged abuse objectively caused "pain," and that the officer involved subjectively had a "sufficiently culpable state of mind."); *Jordan v. Gardner,* 986 F.2d 1521, 1527-31 (9th Cir. 1993) (female inmates stated valid § 1983 Eighth Amendment claim challenging prison policy allowing cross-gender clothed body searches); *Watson v. Jones,* 980 F.2d 1165, 1165-66 (8th Cir. 1992) (summary judgment for defendant female correction officer reversed where inmates alleged sexual harassment and sexual fondling of male prisoners during pat frisks almost daily over a two-month period); *Meriwether v. Faulkner,* 821 F.2d 408 (7th Cir.) (complaint that transexual inmate is regularly forced to strip before male guards and inmates states Eighth Amendment claim), *cert. denied,* 484 U.S. 935, 108 S. Ct. 311 (1987); *Thomas v. District of Columbia,* 887 F. Supp. 1, 4-5 (D.D.C. 1995) (summary judgment for defendant denied where corrections officer sexually harassed plaintiff including touching his penis and tried to coerce prisoner to have sexual relations); *Women Prisoners of District of Columbia Dep't of Corrections v. District of Columbia,* 877 F. Supp. 634 (D.D.C. 1994) (court found numerous violations of the Eighth Amendment for repeated rape, sexual assaults and harassment of female prisoners), *aff'd in part on other grounds, reversed in part on other grounds,* 93 F.3d 910, 928 (D.C. Cir. 1996), *cert. denied,* 117 S. Ct. 1552 (1997), *on remand,* CA No. 93-2052, 1997 WL 361600 at *2-3 (D.D.C. June 16, 1997) (ordering remedial measures to eliminate sexual harassment); *Galvan v. Carothers,* 855 F. Supp. 285, 291 (D. Alaska 1994) ("minimal standards of privacy and decency include the right not to be subject to sexual advances, to use the toilet without being observed by members of the opposite sex, and to shower without being viewed by members of the opposite sex"; nevertheless, summary judgment for defendant on qualified immunity grounds).

9     The Second Circuit summarized Boddie's allegations as follows:

> First, Boddie maintains that on March 3, 1993, Officer B. Schnieder, a female corrections officer, "made a statement" that Boddie believed to be "a pass" at him, but that he "could not be sure."

> Second, Boddie claims that on the next day, Schnieder squeezed his hand, touched his penis, and said, "[Y]ou know your [sic] sexy black devil, I like you."

**Williams v. Keane, Not Reported in F.Supp. (1997)**

1997 WL 527677

Third, Boddie alleges that on March 19, 1993, ... Schnieder stopped [him], accused him of wearing an orange sweatshirt, and told him to take off the sweatshirt. According to Boddie, he resisted, stating that he was a cardiac patient, that the hallway was very cold, and that he would give the sweatshirt to her when they returned to his cellblock. When Boddie began to walk past the officers, Schnieder stopped him, "bumping into [his] chest with both her breast so hard [he] could feel the points of her nipples against [his] chest." Boddie states that Schnieder did this to Boddie twice, pinning him to a door. When he tried to pass her again, Schnieder again bumped into him, this time "with her whole body vagina against penis pinning [him] to the door."

*Id.* at 859-60.

---

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.